*PRELIMINARY PRINT*

VOLUME 606 U. S. PART 2
PAGES 748–830

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 27, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# KENNEDY, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL. *v.* BRAIDWOOD MANAGEMENT, INC., ET AL.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 24–316.   Argued April 21, 2025—Decided June 27, 2025

In 1984, the Department of Health and Human Services (HHS) created the U. S. Preventive Services Task Force, a body that formulates evidence-based recommendations regarding preventive healthcare services.   Congress codified the Task Force's role in 1999, establishing it as an entity within the Agency for Healthcare Research and Quality (AHRQ) in HHS's Public Health Service.   The Task Force currently consists of 16 volunteer members appointed by the Secretary of HHS to staggered 4-year terms.   Before 2010, Task Force recommendations were purely advisory.   The Affordable Care Act of 2010 changed this by requiring most health insurers and group health plans to cover without cost sharing those preventive services that receive "A" or "B" ratings from the Task Force.   The Act also amended the governing statute to describe the Task Force as "independent" and to provide that members and their recommendations "shall be independent and, to the extent practicable, not subject to political pressure."   42 U. S. C. §§ 299b–4(a)(1), (6).

Plaintiffs, individuals and small businesses who object to the Affordable Care Act's preventive-services coverage requirements, sued in federal court.   Lead plaintiff Braidwood Management runs a health and wellness center offering insurance coverage to its approximately 70 employees through a self-insured plan.   Plaintiffs argued that Task Force members are principal officers under the Appointments Clause who must be appointed by the President "with the Advice and Consent of the Senate," Art. II, § 2, cl. 2, not by the Secretary.   The District Court agreed, recognizing that Task Force members are removable at will by the Secretary but concluding they are principal officers because they "have no superior" who supervises and directs them.   627 F. Supp. 3d 624, 646.   While the Government's appeal was pending, the Secretary in June 2023 ratified existing appointments made by the AHRQ Director and began personally appointing Task Force members.   The Fifth Circuit affirmed the District Court, holding that while Task Force members are removable at will, they are not inferior officers because they cannot

be "'independent'" and "free from 'political pressure'" while simultaneously being supervised by a political appointee.   104 F. 4th 930, 944.

*Held*: Task Force members are inferior officers whose appointment by the Secretary of HHS is consistent with the Appointments Clause. Pp. 759–794.

   (a) The Appointments Clause in Article II specifies how "Officers of the United States" must be appointed, dividing all officers into two classes.   Principal officers must be appointed by the President "with the Advice and Consent of the Senate."   Inferior officers likewise may be appointed by Presidential nomination and Senate confirmation, but Congress may also "by Law vest" their appointment "in the President alone, in the Courts of Law, or in the Heads of Departments."   Art. II, §2, cl. 2.   Principal officers encompass at least department heads who report directly to the President.   Inferior officers are those "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."   *Edmond* v. *United States*, 520 U. S. 651, 663.   Pp. 759–761.

   (b) Task Force members are inferior officers because their work is "directed and supervised" by the Secretary of HHS, a principal officer, through two main sources of authority.   Pp. 761–768.

   (1) The Secretary's authority to remove Task Force members at will provides a "powerful tool for control."   *Edmond*, 520 U. S., at 664. An officer's "'presumed desire to avoid removal'" generally creates "'here-and-now subservience.'"   *Bowsher* v. *Synar*, 478 U. S. 714, 727, n. 5.   Here, the Secretary has power to appoint Task Force members, and no statute restricts their removal.   Therefore, the Secretary may remove Task Force members at will, enabling him to supervise and direct them.   Pp. 762–765.

   (2) Beyond at-will removal, the Secretary has statutory authority to directly review and block Task Force recommendations before they take effect.   Several statutes give the Secretary general supervisory authority over the Public Health Service, within which the Task Force is housed, as well as rulemaking authority with respect to the Affordable Care Act's coverage provisions.   See 42 U. S. C. §§202, 300gg–92; Reorganization Plan No. 3 of 1966; 98 Stat. 2705.   During the minimum 1-year interval before recommendations become binding, the Secretary can use his supervisory authority to direct that Task Force recommendations he disagrees with not be "in effect" and therefore not be binding, or he can establish formal review processes through rulemaking. §300gg–13(a)(1).   Task Force members therefore "have no power to render a final decision on behalf of the United States unless permitted to do so by" the Secretary.   *Edmond*, 520 U. S., at 665.   Pp. 765–768.

(c) The conclusion that Task Force members are inferior officers follows *a fortiori* from this Court's precedents.   In *Edmond*, Coast Guard judges who were removable at will and whose decisions could be reviewed and reversed were deemed inferior officers, even though superiors could not influence individual proceedings.   Like those judges, Task Force members are removable at will and their decisions can be reviewed and overruled by the Secretary.   In *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, PCAOB members removable at will by the Securities and Exchange Commission were inferior officers, even though they were "empowered to take significant enforcement actions . . . largely independently of the Commission."   *Id.*, at 504.   In *United States* v. *Arthrex*, 594 U. S. 1, Administrative Patent Judges whose decisions were reviewable but who were removable only for cause were inferior officers.   If patent judges subject only to review authority were inferior officers, Task Force members subject to both at-will removal and review authority are clearly inferior officers.   Pp. 768–770.

(d) Braidwood's arguments against inferior-officer status fail. Pp. 770–779.

(1) The independence provision in § 299b–4(a)(6) stating that Task Force members shall be "independent and, to the extent practicable, not subject to political pressure" does not create for-cause removal protection.   To displace the default of at-will removal, Congress must use "very clear and explicit language"—"mere inference or implication" does not suffice.   *Shurtleff* v. *United States*, 189 U. S. 311, 315.   The term "independent" alone does not make an officer removable only for cause, as this Court held in *Collins* v. *Yellen*, 594 U. S. 220.   Pp. 770–772.

(2) Braidwood claims that 42 U. S. C. § 299b–4(a)(6)'s requirement that Task Force members be "independent and, to the extent practicable, not subject to political pressure" must mean that the Task Force is completely insulated from the Secretary.   But "independent" is best read to mean that Task Force members must not be unduly influenced by their outside professional affiliations with universities, hospitals, and professional associations.   Even if the independence provision meant some insulation from the Secretary when "practicable," that would affect only the formulation of recommendations, not the Secretary's authority to review them before they take effect.   This mirrors the "almost-universal model of adjudication in the Executive Branch" where inferior officers make independent initial decisions subject to review by politically accountable superiors.   *Arthrex*, 594 U. S., at 25 (opinion of Roberts, C. J.).   Pp. 772–776.

(3) The Secretary's inability to compel the Task Force to issue particular "A" or "B" recommendations does not undermine inferior-officer status.   This Court has not suggested that a principal officer must be

able to compel subordinates to take affirmative acts for them to qualify as inferior officers. In *Free Enterprise Fund*, the SEC lacked power to require the PCAOB to "start" investigations, 561 U. S., at 504, yet PCAOB members were inferior officers. Similarly, in *Edmond* and *Arthrex*, superiors could not compel initial decisions. Pp. 776–777.

(4) When Congress wants to create an independent agency, it generally does so by explicitly conferring for-cause removal protection on the agency's leadership and usually couples that protection with express Presidential nomination and Senate confirmation requirements. The statute establishing the Task Force contains none of this customary language. Pp. 778–779.

(e) Congress has by law vested appointment authority in the Secretary of HHS through two steps. First, the 1999 statute governing the Task Force gives the AHRQ Director the authority to "convene" a Task Force "to be composed of individuals with appropriate expertise." §299b–4(a)(1). Congress need not use magic words to confer appointment authority, and around the time of the Founding, "'appoint'" was synonymous with "'allot, assign, or designate.'" *NLRB* v. *SW General, Inc.*, 580 U. S. 288, 312–313 (THOMAS, J., concurring). In the absence of a statutory provision that more explicitly confers appointment authority, the AHRQ Director's power to "convene" is naturally read to include the power to appoint. §299b–4(a)(1). Second, Reorganization Plan No. 3 of 1966, ratified by Congress in 1984, transfers to the Secretary "all functions of the Public Health Service" and its "officers," "employees," and "agencies." 80 Stat. 1610. The AHRQ Director is an "officer" of the Public Health Service, so Reorganization Plan No. 3 transfers all of the AHRQ Director's functions to the Secretary. After statutory codification of the Task Force in 1999, those powers of the Secretary included the AHRQ Director's power to appoint the Task Force members. Therefore, by virtue of the 1984 Act ratifying Reorganization Plan No. 3 and the 1999 Act conferring appointment authority, Congress vested the power to appoint Task Force members in the Secretary of HHS. Pp. 779–786.

(f) Braidwood's arguments that Congress has not properly vested appointment authority in the Secretary fail. Braidwood first claims that the 1999 statute using "convene" does not confer appointment authority and is instead "agnostic" about who should appoint Task Force members. Brief for Respondents 22. Braidwood's interpretation would create a bizarre scheme where Congress was entirely indifferent about who would appoint members making legally binding healthcare recommendations. Braidwood next argues that even if the Director has appointment authority, Reorganization Plan No. 3 does not transfer that power to the Secretary because it applies only to the Director's func-

tions as of 1966. This frozen-in-time reading finds no footing in statutory text or common sense. The Plan's language "all functions" most naturally means an ongoing transfer of authority, including new powers granted by Congress after 1966. 80 Stat. 1610. Pp. 786–793.

(g) The Secretary has properly exercised his appointment authority since June 2023. P. 793.

104 F. 4th 930, reversed and remanded.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, BARRETT, and JACKSON, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ALITO and GORSUCH, JJ., joined, *post*, p. 794.

*Principal Deputy Solicitor General Mooppan* argued the cause for petitioners. On the briefs were *Solicitor General Sauer, Acting Solicitor General Harris, Acting Assistant Attorney General Shumate, Deputy Solicitors General Kneedler* and *Gannon, Ephraim A. McDowell, Michael S. Raab, Daniel Aguilar, Sean R. Keveney,* and *Janice L. Hoffman.*

*Jonathan F. Mitchell* argued the cause and filed briefs for respondents.*

———————

*Briefs of *amici curiae* urging reversal were filed for the State of Illinois et al. by *Kwame Raoul,* Attorney General of Illinois, *Jane Elinor Notz,* Solicitor General, *Alex Hemmer,* Deputy Solicitor General, and *Samantha Sherman,* Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Kris Mayes* of Arizona, *Rob Bonta* of California, *Philip J. Weiser* of Colorado, *William Tong* of Connecticut, *Kathleen Jennings* of Delaware, *Brian L. Schwalb* of the District of Columbia, *Anne E. Lopez* of Hawaii, *Aaron M. Frey* of Maine, *Anthony G. Brown* of Maryland, *Andrea Joy Campbell* of Massachusetts, *Dana Nessel* of Michigan, *Keith Ellison* of Minnesota, *Aaron D. Ford* of Nevada, *Matthew J. Platkin* of New Jersey, *Raúl Torrez* of New Mexico, *Letitia James* of New York, *Jeff Jackson* of North Carolina, *Dan Rayfield* of Oregon, *Peter F. Neronha* of Rhode Island, *Charity R. Clark* of Vermont, *Nicholas W. Brown* of Washington, and *Joshua L. Kaul* of Wisconsin; for the American Hospital Association et al. by *Chad Golder*; for the American Public Health Association et al. by *Andrew J. Pincus*; for the Center for HIV Law and Policy et al. by *David W. DeBruin*; for the HIV and Hepatitis Policy Institute et al. by *Richard H. Hughes IV, Spreeha*

JUSTICE KAVANAUGH delivered the opinion of the Court.

This case concerns the Appointments Clause in Article II of the Constitution. The U. S. Preventive Services Task Force, an entity within the Department of Health and Human Services, issues public recommendations about preventive healthcare services—for example, cancer and diabetes screenings. Before 2010, the Task Force's recommenda-

*Choudhury*, and *Devon Minnick*; for Members of the Chronic Illness and Disability Partnership by *Benjamin G. Shatz* and *Carmel Shachar*; for the National Alliance of State and Territorial AIDS Directors et al. by *Jose I. Abrigo, Jr., Omar Gonzalez-Pagan, Karen L. Loewy, Christopher R. Riano, Bennett Klein, Chris Erchull*, and *Suman Chakraborty*; for Patient and Physician Professional Organizations by *Beth Petronio, John Longstreth*, and *Mary Rouvelas*; for Public Citizen et al. by *Nicolas A. Sansone, Allison M. Zieve*, and *Scott L. Nelson*; for the Susan G. Komen Breast Cancer Foundation, Inc., by *David C. Frederick*; for United States of Care et al. by *Daniel G. Jarcho*; and for 48 Bipartisan Economic and Other Social Science Scholars by *Matthew S. Hellman*.

Briefs of *amici curiae* urging affirmance were filed for the State of Texas et al. by *Ken Paxton*, Attorney General of Texas, *Aaron L. Nielson*, Solicitor General, *Brent Webster*, First Assistant Attorney General, *William F. Cole*, Principal Deputy Solicitor General, and *Eric Abels*, Assistant Attorney General, and by the Attorneys General for their respective States as follows: *James Uthmeier* of Florida, *Raúl Labrador* of Idaho, *Theodore E. Rokita* of Indiana, *Brenna Bird* of Iowa, *Liz Murrill* of Louisiana, *Lynn Fitch* of Mississippi, *Austin Knudsen* of Montana, *Michael T. Hilgers* of Nebraska, *Dave Yost* of Ohio, *Gentner Drummond* of Oklahoma, *Alan Wilson* of South Carolina, *Marty Jackley* of South Dakota, *Jonathan Skrmetti* of Tennessee, *Derek Brown* of Utah, and *John B. McCuskey* of West Virginia; for the Association of American Physicians and Surgeons by *Andrew L. Schlafly*; for the Buckeye Institute by *Jay R. Carson* and *David C. Tryon*; for the Cato Institute by *Thomas Berry*; for the Goldwater Institute by *Timothy Sandefur*; for the Manhattan Institute by *R. Trent McCotter* and *Ilya Shapiro*; and for the Pacific Legal Foundation by *Michael Poon*.

Briefs of *amici curiae* were filed for the American College of Gastroenterology by *Andrew E. Tauber*; for the Christian Employers Alliance by *Erin M. Hawley, John J. Bursch, Matthew S. Bowman, James A. Campbell*, and *Daniel J. Grabowski*; and for Gilead Sciences, Inc., by *Kwaku A. Akowuah* and *Madeleine Joseph*.

tions were purely advisory. But the Affordable Care Act of 2010 now mandates that health insurers cover some of the recommended services at no cost to the insured.

The Secretary of Health and Human Services appointed the 16 current members of the Task Force. The question in this case is whether appointment of Task Force members by the Secretary is consistent with the Appointments Clause in Article II. That question turns on whether the Task Force members are principal officers or inferior officers. Principal officers must be nominated by the President and confirmed by the Senate. That process can be lengthy and therefore can hinder the Executive Branch's ability to promptly fill offices—and thus also impede the President's ability to execute the laws through his subordinate executive officers. By contrast, inferior executive officers may be directly appointed by the President or by the head of a department, such as by the Secretary of HHS—a more efficient and expeditious process.

The Executive Branch under both President Trump and President Biden has argued that the Preventive Services Task Force members are inferior officers and therefore may be appointed by the Secretary of HHS. We agree. The Task Force members are removable at will by the Secretary of HHS, and their recommendations are reviewable by the Secretary before they take effect. So Task Force members are supervised and directed by the Secretary, who in turn answers to the President, preserving the chain of command in Article II. See *Edmond* v. *United States*, 520 U. S. 651, 663 (1997). Therefore, under Article II and this Court's precedents, the Task Force members are inferior officers. As a result, appointment of Task Force members by the Secretary of HHS is consistent with the Appointments Clause.

I

A

In 1984, the Department of Health and Human Services created an advisory body known as the U. S. Preventive

Services Task Force. The Task Force formulates and publishes evidence-based recommendations regarding preventive healthcare services.

In 1999, Congress enacted legislation codifying the role of the Task Force. See §915, 113 Stat. 1659. That legislation established the Task Force as an entity within the Agency for Healthcare Research and Quality (AHRQ), which in turn is an agency in the Public Health Service within HHS.

Under that 1999 statute, the Director of AHRQ "convene[s]" the Task Force, which is "to be composed of individuals with appropriate expertise." *Ibid.*; see 42 U. S. C. §299b–4(a)(1). The Task Force reviews "the scientific evidence related to the effectiveness, appropriateness, and cost-effectiveness of clinical preventive services for the purpose of developing recommendations for the health care community." §299b–4(a)(1).

As presently constituted, the Task Force consists of 16 members who are now appointed by the Secretary of HHS to staggered 4-year terms. Those members are "nationally recognized experts in prevention, evidence-based medicine, and primary care." App. 39. They include researchers, professors, and practicing physicians with experience and expertise in public health and across a wide range of medical specialties. They serve on a volunteer basis, so they are not paid by the Federal Government for their service on the Task Force.

Preventive services "can help people avoid acute illness, identify and treat chronic conditions, prevent cancer or lead to earlier detection, and improve health." HHS, Issue Brief—Access to Preventive Services Without Cost-Sharing: Evidence From the Affordable Care Act 1 (Jan. 2022). A wide range of individuals and organizations rely on the Task Force's preventive-services recommendations. They include "health care systems, professional societies, employers," "Congress and other policymakers, governmental public health agencies," and those directly "delivering clinical

services," such as "primary care professionals."   § 299b–4(a)(1).

The Task Force develops recommendations through a standardized process.   It selects a topic to study, reviews the relevant scientific evidence, formulates a draft recommendation statement, takes public comments, and then votes on the final recommendation.

The Task Force uses a letter grading system for its recommendations.   It assigns an "A" grade to services with a high certainty of substantial net benefit and a "B" grade to services with at least a moderate certainty of a moderate net benefit.   It also issues "C" and "D" grades to services with little to no net benefit, and an "I" grade to services for which the current evidence is "insufficient" to assess the balance of benefits and harms.   App. 46.   The Task Force can vote to change the grade that was assigned in a previous recommendation.

The Task Force has given an "A" or "B" rating to more than 40 preventive services.   Those services include screenings to detect lung, breast, cervical, and colorectal cancer; risk-reducing medications for women at high risk of breast cancer; nicotine patches for adults trying to quit smoking; statin medications to reduce the risk of heart disease and stroke; physical therapy to help the elderly avoid falls; and diabetes screenings.

For many years after its initial creation in 1984 and codification in 1999, the Task Force's recommendations were purely advisory.   That changed in 2010 when Congress passed and President Obama signed the Affordable Care Act. 124 Stat. 119.   That Act requires most health insurers and group health plans to cover certain preventive services without cost sharing—that is, without imposing copayments, deductibles, or other charges on patients.

Rather than set forth a fixed list, the Act tied coverage for preventive services to the recommendations of several entities within the Federal Government, including the Pre-

ventive Services Task Force. Specifically, the Act mandates no-cost coverage of "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations" of the Task Force. § 300gg–13(a)(1).

After the Task Force makes an "A" or "B" recommendation, the insurance coverage requirements for that preventive service do not take effect immediately. Rather, the law directs the Secretary of HHS to "establish a minimum interval," not less than one year, between when an "A" or "B" recommendation is issued by the Task Force and when insurers must cover the recommended service without cost sharing. § 300gg–13(b). During that interval, the Secretary can review the Task Force's recommendation and block it from going into effect.

The Affordable Care Act also amended the statute governing the Task Force to describe the Task Force as "independent" and to provide that the members of the Task Force and their recommendations "shall be independent and, to the extent practicable, not subject to political pressure." §§ 299b–4(a)(1), (6).

## B

The question in this case is whether the Task Force members were appointed in a manner consistent with the Appointments Clause in Article II of the Constitution. § 2, cl. 2.

The plaintiffs are several individuals and small businesses who object to the Affordable Care Act's preventive-services coverage requirements. The lead plaintiff, Braidwood Management, runs a health and wellness center. It offers health-insurance coverage to its approximately 70 employees through a self-insured plan. Braidwood wants to exclude coverage for certain drugs and to impose copays or deductibles for other covered services.

The plaintiffs—collectively, Braidwood—sued in the U. S. District Court for the Northern District of Texas. Braidwood argued that the structure of the Task Force violated

the Appointments Clause. In Braidwood's view, Task Force members are principal officers who must be appointed by the President "with the Advice and Consent of the Senate." *Ibid.*

The District Court agreed. It recognized that there are no statutory removal restrictions on Task Force members, meaning that the Secretary of HHS may remove them at will. But the court nonetheless concluded that Task Force members are unconstitutionally appointed principal officers because they "have no superior" who supervises and directs them. *Braidwood Mgmt. Inc.* v. *Becerra,* 627 F. Supp. 3d 624, 646 (ND Tex. 2022). The court enjoined the Government from enforcing against Braidwood any insurance coverage mandates based on Task Force recommendations issued after the 2010 enactment of the Affordable Care Act.[1]

The Government appealed to the U. S. Court of Appeals for the Fifth Circuit. Until that point, the Task Force members had been selected and appointed by the Director of AHRQ, an agency within the Public Health Service of HHS. But in June 2023, while the Government's appeal was pending, the Secretary of HHS ratified the appointments of the existing Task Force members and re-appointed them on a prospective basis. And from then on, the Secretary has continued to appoint Task Force members.

The Fifth Circuit affirmed in relevant part. In a thorough opinion, the court held that the Task Force members are principal officers who must be appointed by the President with the advice and consent of the Senate. Like the District Court, the Fifth Circuit understood the Task Force members

---

[1] Braidwood also brought a claim under the Religious Freedom Restoration Act of 1993, 107 Stat. 1488, 42 U. S. C. § 2000bb *et seq.* It prevailed on that claim and secured an injunction against enforcement of the specific requirement that it cover certain HIV-prevention medications without cost sharing. The Government did not appeal that aspect of the District Court's judgment, and this Court's decision will not affect the injunction premised on Braidwood's RFRA claim.

to be removable at will by the Secretary of HHS. But the Fifth Circuit concluded that the Secretary cannot block Task Force recommendations before they take effect. The court pointed to 42 U. S. C. § 299b–4(a)(6), which provides that Task Force members "shall be independent and, to the extent practicable, not subject to political pressure." The Task Force, according to the Fifth Circuit, "cannot be 'independent' and free from 'political pressure' on the one hand, and at the same time be supervised by the HHS Secretary, a political appointee, on the other." *Braidwood Mgmt., Inc.* v. *Becerra*, 104 F. 4th 930, 944 (2024). So the court concluded that the Task Force is not supervised and directed by the Secretary—and that Task Force members are therefore principal officers and may not be appointed by the Secretary.

We granted certiorari to consider whether appointment of Task Force members by the Secretary of HHS violates the Appointments Clause. 604 U. S. 1073 (2025).

## II

### A

The Appointments Clause in Article II of the Constitution specifies how "Officers of the United States," as distinct from employees, must be appointed. §2, cl. 2. An officer exercises "'significant authority pursuant to the laws of the United States.'" *Lucia* v. *SEC*, 585 U. S. 237, 245 (2018). An employee, by contrast, does not exercise significant governmental authority. See *ibid.*

The text of the Appointments Clause "very clearly divides all its officers into two classes": principal officers and inferior officers. *United States* v. *Germaine*, 99 U. S. 508, 509 (1879). Here, all agree that the Preventive Services Task Force members are officers. The question is whether they are principal or inferior.

Principal officers must be appointed by the President "with the Advice and Consent of the Senate." Art. II, §2, cl. 2. The constitutionally mandated joint participation of

the President and Senate in the appointments process is designed to promote "a judicious choice" for "filling the offices of the Union." The Federalist No. 76, p. 455 (C. Rossiter ed. 1961) (A. Hamilton). The President and the Senate are accountable "for both the making of a bad appointment and the rejection of a good one." *Edmond* v. *United States*, 520 U. S. 651, 660 (1997).

Inferior officers may also be appointed via Presidential nomination and Senate confirmation. See Art. II, § 2, cl. 2. The Framers, though, recognized that requiring *all* officers of the Federal Government to run the gauntlet of Presidential nomination and Senate confirmation would prove administratively unworkable as offices became "numerous" and "sudden removals" and prompt replacements became "necessary." *Germaine*, 99 U. S., at 510. So on one of the last days of the Constitutional Convention—September 15, 1787—they authorized an additional and streamlined method of appointment for inferior officers. Specifically, Congress may "by Law vest" appointment of inferior officers "in the President alone, in the Courts of Law, or in the Heads of Departments." Art. II, § 2, cl. 2. Congress therefore may provide that inferior executive officers be unilaterally appointed by the President or a Head of Department.

The Appointments Clause is "more than a matter of 'etiquette or protocol' "—it is "among the significant structural safeguards of the constitutional scheme." *Edmond*, 520 U. S., at 659. The Appointments Clause ensures that the President or his subordinate Heads of Departments play a central role in selecting the officers within the Executive Branch who will assist in exercising the "executive Power." Art. II, § 1, cl. 1. The Clause thereby helps protect the independence of the Executive Branch and maintain the Constitution's separation of powers.

How does a court determine whether an executive officer is principal (and must be appointed by the President with

the advice and consent of the Senate) or inferior (and may be appointed by the President or Head of Department alone)?

Principal officers in the Executive Branch encompass at least the Heads of Departments, who report directly to the President. Examples include the Secretary of State, Secretary of the Treasury, Secretary of Defense, and Attorney General.

Inferior officers are most readily defined by their relationship to principal officers. "Generally speaking," whether "one is an 'inferior' officer depends on whether he has a superior" other than the President, *Edmond*, 520 U. S., at 662, and how much power the officer "exercises free from control by a superior," *United States* v. *Arthrex, Inc.*, 594 U. S. 1, 17 (2021). In *Edmond* v. *United States*, the Court summarized the governing principle: Inferior officers are those "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." 520 U. S., at 663.

As the author of *Edmond*, Justice Scalia, once explained: "It is perfectly obvious" that the language in Article II authorizing department heads to appoint inferior officers "was intended merely to make clear . . . that those officers appointed by the President with Senate approval could on their own appoint their subordinates, who would, of course, by chain of command still be under the direct control of the President." *Morrison* v. *Olson*, 487 U. S. 654, 720–721 (1988) (Scalia, J., dissenting).

B

Before 2010, members of the Preventive Services Task Force were not officers at all. The Task Force was an advisory body, and the Task Force members made only nonbinding recommendations. As a result of the 2010 Affordable Care Act, however, the Task Force's "A" and "B" recommended preventive services now must be covered by health

insurers at no cost to the insured. For that reason, the parties here agree that the Task Force members exercise significant governmental authority and qualify as "officers" of the United States. They disagree, however, over whether Task Force members are principal or inferior officers.

We conclude that Task Force members are inferior officers because their work is "directed and supervised" by the Secretary of HHS, a principal officer. *Edmond*, 520 U. S., at 663. The Secretary's ability to direct and supervise the Task Force derives from two main sources: the Secretary's authority to remove Task Force members at will; and the Secretary's authority to review and block the Task Force's recommendations before they can take effect.

1

An officer such as a Task Force member who is removable at will by a principal officer (here, by the Secretary of HHS) typically qualifies as an inferior officer. So it is here.

This Court has said that the authority to remove an officer at will is a "powerful tool for control." *Edmond*, 520 U. S., at 664; see *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 510 (2010). The reason is straightforward: "'Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey.'" *Bowsher* v. *Synar*, 478 U. S. 714, 726 (1986). An officer's "'presumed desire to avoid removal'" generally creates a "'here-and-now subservience.'" *Id.*, at 727, n. 5. The prerogative of at-will removal of a subordinate, then, often carries with it the power to supervise and direct that subordinate. See *Intercollegiate Broadcasting System, Inc.* v. *Copyright Royalty Bd.*, 684 F. 3d 1332, 1341 (CADC 2012) (Williams, J.).

Historical practice supports treating an officer who is removable at will by a principal officer as an inferior officer. Since the Founding, Congress has routinely tied inferior-

officer status to at-will removability by Heads of Departments. See *Ex parte Hennen*, 13 Pet. 230, 259–260 (1839). For example, in designating the "chief Clerk in the Department of Foreign Affairs" as an "inferior officer," the First Congress made clear that the Clerk was "to be employed" as the Secretary of Foreign Affairs "shall deem proper." Act of July 27, 1789, ch. 4, 1 Stat. 29. The same was true of the Chief Clerk of the Department of War. See Act of Aug. 7, 1789, ch. 7, 1 Stat. 49–50. In 1839 in *Hennen*, this Court explained that the First Congress had bestowed upon the Secretaries of various Departments the authority to "appoint all necessary clerks"; that those clerks were subject to at-will removal by the Secretaries; and that they fell "under that class of inferior officers." 13 Pet., at 259–260; see, *e. g.*, Act of Apr. 30, 1798, ch. 35, 1 Stat. 553–554 (clerks to the Secretary of the Navy); see also, *e. g.*, Act of Sept. 2, 1789, ch. 12, 1 Stat. 65 (assistant to the Secretary of the Treasury); Act of Feb. 20, 1792, ch. 7, 1 Stat. 234 (deputy postmasters).

On the other side of the ledger, Braidwood has not identified any instance where an executive officer was removable at will by someone other than the President and nonetheless deemed a principal officer.

Here, because the Secretary of HHS appoints the Task Force members, he also has the authority to remove the Task Force members at will. See *Braidwood Mgmt. Inc.* v. *Becerra*, 627 F. Supp. 3d 624, 647 (ND Tex. 2022); *Braidwood Mgmt., Inc.* v. *Becerra*, 104 F. 4th 930, 943 (CA5 2024). When a statute empowers a department head to appoint an officer, the default presumption is that the officer holds his position "at the will and discretion of the head of the department," even if "no power to remove is expressly given." *Hennen*, 13 Pet., at 259–260. That is because the "power of removal of executive officers" is "incident to the power of appointment." *Myers* v. *United States*, 272 U. S. 52, 119 (1926). As this Court recently summarized in *Free Enterprise Fund* v. *Public Company Accounting Oversight*

*Board*, when as here Congress vests appointment of inferior officers in "heads of departments," "it is ordinarily the department head . . . who enjoys the power of removal." 561 U. S., at 493.

The Secretary of HHS has the power to appoint (and has appointed) the Task Force members. See Part III, *infra.* And no statute restricts removal of Task Force members. Therefore, "there can be no doubt" that the Secretary may remove Task Force members at will. *Hennen*, 13 Pet., at 259.

The Secretary's authority to remove Task Force members at will in turn enables him to supervise and direct them. When a Task Force member makes a decision that the Secretary disagrees with, the Secretary may remove that member. In other words, the Secretary "may consider the decision after its rendition as a reason for removing" the Task Force member, "on the ground that the discretion regularly entrusted to" that member "has not been on the whole intelligently or wisely exercised." *Myers*, 272 U. S., at 135.

In addition, the Secretary can block a Task Force recommendation from taking effect by combining his at-will removal authority with his authority to determine *when* Task Force recommendations become binding.

To explain: The Affordable Care Act expressly affords the Secretary the power to "establish a minimum interval" between when the Task Force issues an "A" or "B" recommendation and when insurers must cover the recommended service without cost sharing. 42 U. S. C. §300gg–13(b)(1). Congress specified that the minimum interval "shall not be less than 1 year," leaving the Secretary with discretion to set a longer minimum interval. §300gg–13(b)(2).

So during the minimum 1-year period after the Task Force makes a recommendation before it becomes binding, the Secretary can request that the Task Force reconsider or withdraw a recommendation that he disfavors. He has plenty of time to remove and replace Task Force members who refuse.

And he can then request that the reconstituted Task Force modify or rescind the recommendation. Therefore, in this statutory scheme, the Secretary can use his at-will removal power to stop any preventive-services recommendation contrary to his judgment from taking effect.

In short, through the power to remove and replace Task Force members at will, the Secretary can exert significant control over the Task Force—including by blocking recommendations he does not agree with. The Secretary's power to supervise and direct Task Force members in that way is a strong indication that the Task Force members are inferior officers.

2

Regardless of whether the Secretary's authority to remove Task Force members at will suffices on its own to render them inferior officers, the Secretary also has statutory power to directly review and block Task Force recommendations before they take effect. That power confirms that the Task Force members are inferior officers.

At-will removal is one means of ensuring supervision and direction. But in evaluating inferior-officer status, the Court has also examined whether the relevant officer has the "power to render a final decision on behalf of the United States" without review by a principal officer. *Edmond*, 520 U. S., at 665.

That consideration has taken on particular importance in assessing whether adjudicative officers are principal or inferior. See *id.*, at 664–665; *Arthrex*, 594 U. S., at 13–14. If an adjudicative officer's decisions are reviewable by a superior, then the officer may be considered inferior even if not removable at will. See *Arthrex*, 594 U. S., at 16–17; *id.*, at 25–26 (opinion of ROBERTS, C. J.).[2]

_____

[2] Review by an Article III court does not render the adjudicative officer inferior; it is review by a superior within the Executive Branch that does so. See *Arthrex*, 594 U. S., at 17.

Opinion of the Court

Here, the Secretary's power to supervise and direct the Task Force members derives from more than simply at-will removal authority.   As explained, at-will removal provides the Secretary with a means of ensuring that no recommendation that he disapproves will take effect.   But the Secretary also has the statutory authority to directly review—and, if necessary, block—Task Force recommendations before they take effect.   So members of the Task Force cannot make any legally binding, final decision on behalf of the United States if the Secretary disagrees and wants to block it.   As a result, the Secretary retains ultimate responsibility over whether Task Force recommendations become final decisions that mandate no-cost coverage by health insurers.

To spell this out: A collection of statutes grants the Secretary general supervisory authority over the Task Force. That supervisory authority in turn enables the Secretary to review and, if he chooses, directly block a recommendation he disagrees with.

*First*, 42 U. S. C. § 202 provides that the Public Health Service, which houses the Task Force, "shall be administered . . . under the supervision and direction of the Secretary."

*Second*, Reorganization Plan No. 3 of 1966 grants the Secretary authority to perform "all functions of the Public Health Service" and its "officers," "employees," and "agencies."   80 Stat. 1610.[3]

---

[3] Braidwood contends that the Reorganization Plan does not apply to the Task Force because the Plan contains an exception for "the functions vested by law in any advisory council, board, or committee of or in the Public Health Service."   80 Stat. 1610.   That is incorrect.   As Braidwood itself has explained, the Task Force "ceased to be an advisory committee" in 2010 "when Congress enacted" the Affordable Care Act and "empowered" the Task Force to issue binding recommendations.   App. 25.   Task Force members are officers because, by operation of the ACA, their "A" and "B" recommendations are not purely advisory.   And Congress has confirmed that the post-ACA Task Force is not an advisory entity by expressly providing that "the Task Force is not subject to" the Federal Advisory Committee Act.   42 U. S. C. § 299b–4(a)(5) (2018 ed., Supp. IV).

*Third*, 42 U. S. C. §300gg–92 states that the Secretary "may promulgate such regulations as may be necessary or appropriate to carry out the provisions of this subchapter"— including the section of the Affordable Care Act that requires no-cost coverage of Task Force "A" and "B" recommendations.

The Affordable Care Act mandates coverage without cost sharing of "evidence-based items or services that have *in effect* a rating of 'A' or 'B'" from the Task Force.  §300gg–13(a)(1) (emphasis added).  During the minimum 1-year interval, the Secretary can use his general supervisory authority under §202 and Reorganization Plan No. 3 to direct that the Task Force's recommendation not be "in effect" and therefore not be binding on health insurers.  Moreover, the Secretary can use his rulemaking authority under §300gg–92 to establish a formal review process.  For example, the Secretary can issue a regulation providing that no Task Force recommendation shall be deemed "in effect" until he or his designee has affirmatively reviewed and approved it.[4]

Taken together, those complementary review authorities ensure that the Task Force members "have no power to render a final decision on behalf of the United States unless permitted to do so by" the Secretary of HHS.  *Edmond*, 520 U. S., at 665.  To be clear, to supervise and direct for purposes of the Appointments Clause, the Secretary "need not review every decision."  *Arthrex*, 594 U. S., at 27.  Rather, "[w]hat matters is that" the Secretary "have the *discretion* to review decisions rendered by" the Task Force.  *Ibid.* (em-

_____

[4] The body within HHS assigned to recommend immunization coverage requirements under the Affordable Care Act—the Advisory Committee on Immunization Practices—already operates under such a regulation.  The regulation states that a recommendation of the Committee is not "considered in effect" until "it has been adopted by" the Director of the Centers for Disease Control and Prevention, who answers to the Secretary of HHS.  45 CFR §147.130(a)(1)(ii) (2024).

phasis added). Under the statutory provisions described above, the Secretary possesses that authority.[5]

## C

Given the multiple and mutually reinforcing means by which the Secretary of HHS can supervise and direct the Task Force—namely, both the general authority to remove Task Force members at will and the more specific statutory authority to review and block their recommendations before they take effect—this Court's precedents preordain the conclusion that the Task Force members are inferior officers.

In *Edmond* v. *United States*, the Court ruled that judges of the Coast Guard Court of Criminal Appeals were inferior officers. See 520 U. S., at 666. In reaching that conclusion, the Court emphasized that (i) the Judge Advocate General, who exercised administrative oversight over the judges, could remove them at will and (ii) the Court of Appeals for the Armed Forces could review and reverse their decisions. See *id.*, at 664–665. The Court reached that inferior-officer conclusion even though, pursuant to the Uniform Code of Military Justice, no superior could "attempt to influence (by

---

[5] The dissent asserts that § 202 and the Reorganization Plan are inapplicable because those statutes give the Secretary authority over the Public Health Service, and the Task Force is not part of the Public Health Service at all. *Post*, at 826–827 (opinion of THOMAS, J.). At oral argument, the Government succinctly summed up why the dissent's position is incorrect: "[W]hen you have an entity that's convened by the Public Health Service, selected by the Public Health Service, supervised by the Public Health Service, and supported by the Public Health Service, it's part of the Public Health Service." Tr. of Oral Arg. 34; see also *post*, at 798 (The "AHRQ," which "is part of the Public Health Service," is "responsib[le] for the Task Force"). No doubt that is why the provisions governing the Task Force are housed within the chapter of the U. S. Code entitled "Public Health Service." See 42 U. S. C. ch. 6A. Braidwood does not even try to claim that the Task Force falls outside of the Public Health Service—on the contrary, it concedes that, from the outset, the Task Force has been established as an entity "within the Public Health Service." Supp. Brief for Respondents 1; Brief for Respondents 34–35.

threat of removal or otherwise) the outcome of individual proceedings" conducted by the Coast Guard judges. *Id.*, at 664 (citing 10 U. S. C. §837).

Like the Coast Guard judges in *Edmond*, the Task Force members here are removable at will and their decisions can be reviewed and overruled by a superior—here, the Secretary of HHS. Therefore, the result in this case follows *a fortiori* from *Edmond*.

In *Free Enterprise Fund*, the Court considered whether members of the Public Company Accounting Oversight Board were inferior officers. See 561 U. S., at 510. After finding the members of the PCAOB removable at will by the Securities and Exchange Commission, the Court concluded that PCAOB members were inferior officers. See *id.*, at 508–510. The fact that the PCAOB was nonetheless "empowered to take significant enforcement actions . . . largely independently of the Commission" was no barrier to that conclusion. *Id.*, at 504.

In this case, the Task Force members are removable at will, just as the PCAOB members were. And Task Force members have no greater power than PCAOB members did to independently make final, binding decisions. So the result in this case also follows directly from *Free Enterprise Fund*.

And in *United States* v. *Arthrex*, after ensuring that the Director of the Patent and Trademark Office had authority to review final decisions issued by Administrative Patent Judges, the Court deemed those judges to be inferior officers—even though they were removable only *for cause* and thus insulated from at-will removal. See 594 U. S., at 16–17; *id.*, at 25–26 (opinion of ROBERTS, C. J.).

If the patent judges in *Arthrex*, whose decisions were reviewable but who were not removable at will, were inferior officers, then there can be no doubt that the Task Force members, who are subject to both forms of control, are inferior officers.

In sum, considering the Secretary's removal and review authorities together, the inferior-officer issue is quite straightforward under *Edmond*, *Free Enterprise Fund*, and *Arthrex*.  In light of those precedents, "we have no hesitation in concluding" that Task Force members are inferior officers whose appointment by the Secretary of HHS is permissible under the Appointments Clause.  *Free Enterprise Fund*, 561 U. S., at 510.

D

On three separate grounds, Braidwood resists the conclusion that Task Force members are inferior officers.  *First*, Braidwood claims that Task Force members cannot be removed at will.  *Second*, Braidwood contends that Task Force members exercise unreviewable authority in making preventive-services recommendations.  *Third*, Braidwood posits that Task Force members cannot be inferior officers because the Secretary lacks power to compel the Task Force *to issue* a particular recommendation, as opposed to power to block a recommendation.  None of the three arguments is persuasive.

1

Braidwood first claims that the Secretary cannot remove Task Force members at will.  It rests that argument on 42 U. S. C. §299b–4(a)(6).  That provision states that Task Force members and their recommendations shall be "independent and, to the extent practicable, not subject to political pressure."  See also §299b–4(a)(1) ("The Director shall convene an independent Preventive Services Task Force").

According to Braidwood, it is impossible for Task Force members to be "independent" if they are also removable at will.  So they must not be removable at will, Braidwood reasons.

In essence, Braidwood invites the Court to read a for-cause removal restriction into a statute that does not explicitly provide for one.  We decline to do so.  The Court has

said that to "take away" the power of at-will removal from an appointing officer, Congress must use "very clear and explicit language." *Shurtleff* v. *United States*, 189 U. S. 311, 315 (1903); see *Hennen*, 13 Pet., at 259–260. "[M]ere inference or implication" does not suffice. *Shurtleff*, 189 U. S., at 315.

When Congress wants to depart from the default of at-will removability and instead furnish for-cause protection, it knows how to do so. In many statutes, Congress has specified that officers shall be removed only for good cause, often using a formulation like "inefficiency, neglect of duty, or malfeasance in office." 15 U. S. C. §41 (Federal Trade Commissioners); 42 U. S. C. §7171(b)(1) (Federal Energy Regulatory Commission members); 49 U. S. C. §1301(b)(3) (Surface Transportation Board members); see also *Arthrex*, 594 U. S., at 17 (Patent judges may be removed only " 'for such cause as will promote the efficiency of the service' " (quoting 5 U. S. C. §7513(a))).

In fact, Congress has done so with respect to members of other bodies that, like the Task Force, are within the Public Health Service of HHS: Ethics board members who review research involving human subjects may be removed only "for neglect of duty or malfeasance or for other good cause shown." 42 U. S. C. §289a–1(b)(5)(E). Notably, however, Congress did not employ that kind of language in the statute governing the Task Force.

Braidwood nonetheless suggests that the term "independent" in this statute suffices to displace the default of at-will removal. But this Court already rejected that move in *Collins* v. *Yellen*. There, the challengers argued that the Acting Director of the Federal Housing Finance Agency must have been removable only for cause because Congress described the agency as " 'independent.' " 594 U. S. 220, 248 (2021) (quoting 12 U. S. C. §4511(a); emphasis deleted). The Court disagreed, concluding that the challengers read "far too much into the term 'independent.' " 594 U. S., at 248.

The Court explained that "Congress has described many agencies as 'independent' without imposing any restriction on the President's power to remove the agency's leadership." *Id.*, at 249.

Given *Collins*, Braidwood's argument based on the term "independent" falls short. The word "independent" alone in a statute does not make an officer removable only for cause. Rather, Congress must speak clearly if it wishes to insulate officers from at-will removal. It has not done so here.

2

Next, Braidwood insists that the Task Force members cannot be inferior officers because, in Braidwood's view, they exercise unreviewable authority in making final recommendations that are binding on health insurers. In other words, Braidwood contends that the Secretary cannot prevent the Task Force's "A" and "B" recommendations from taking effect, and that the Task Force members are therefore not inferior officers.

The premise is wrong. As we have explained, the Secretary in fact has authority to review the Task Force's recommendations and can block them from taking effect.

Braidwood's argument to the contrary is, essentially, just another version of its first argument. Braidwood again falls back on the independence provision. Braidwood claims that § 299b–4(a)(6)'s requirement that Task Force members be "independent and, to the extent practicable, not subject to political pressure" must mean that the Task Force is completely insulated from the Secretary. As Braidwood sees it, the Task Force's recommendations cannot be "independent" or free from "political pressure" if the Secretary can review and block them. We disagree for two distinct reasons.

*First*, the requirement that Task Force members be "independent" is best read to mean that Task Force members must not be unduly influenced by their outside affiliations. Task Force members hail from universities, hospitals, and

professional associations. The requirement that they be "independent" instructs them not to act as mere agents or representatives of those outside entities. See Brief for United States 32 (members "must not regard themselves as mere representatives of the organizations or professions in which they serve"); Brief for State of Illinois et al. as *Amici Curiae* 13 (the provision ensures that members are not "operating at the behest of external entities" given their "professional and organizational ties").

To reinforce that critical aspect of independence, Task Force members are subject to rigorous conflict-of-interest rules. See App. 42–44. The stated purpose of those rules is to protect the public's "confidence in the integrity of the process by which the Task Force makes its recommendations." *Id.*, at 42.

Moreover, it would not make sense to read "independent" in §299b–4(a)(6) more broadly to also mean insulation from politically accountable superiors. That is because the remainder of §299b–4(a)(6) expressly provides that Task Force members shall be, "*to the extent practicable*, not subject to political pressure." (Emphasis added.) Congress therefore plainly contemplated that insulation from *all* political pressure would be *im*practicable. So to read the term "independent" to mean that Task Force members must be entirely shielded from political pressure would nullify Congress's purposeful choice of language—"to the extent practicable"—in the remainder of the provision. §299b–4(a)(6). Where one reading of part of a statutory provision "deprives another" part "of all independent effect" and another reading "leaves both . . . with some independent operation," we generally prefer the latter. A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 176 (2012).

*Second*, even if we were to interpret "independent" to apply to political pressure, the phrase "independent and, to the extent practicable, not subject to political pressure" would mean only that Task Force members are generally

free from the Secretary's influence in their *formulation* of recommendations in the first instance. The Secretary would still retain power to review and block recommendations in the minimum 1-year period before the recommendations take effect.

Braidwood disagrees. It contends that the Secretary's only power with respect to the Task Force's recommendations is to determine *when* they take effect. It says that § 300gg–13 makes the Task Force's recommendations binding after the minimum 1-year interval regardless of what the Secretary does. But that understanding of the statute cannot be squared with the provisions discussed above that give the Secretary general supervisory authority over the Task Force.

So given the Secretary's review authority, Congress's instruction that Task Force members and their recommendations be "independent and, to the extent practicable, not subject to political pressure" means at most that Task Force members can exercise independent judgment in generating recommendations on the front end—in the same way that the Coast Guard judges in *Edmond* and the patent judges in *Arthrex* made initial adjudicative decisions free from direction by superiors.

In that way, the Task Force's operation vis-à-vis the Secretary is entirely consistent with Congress's longstanding practice—reflected in *Edmond* and *Arthrex*—of authorizing inferior-officer adjudicators in the Executive Branch to make initial, independent decisions that are only then subject to review by a superior officer. The "modern federal hearing examiner or administrative law judge" generally "exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency." *Butz* v. *Economou*, 438 U. S. 478, 513 (1978). But "it certainly is the norm for principal officers to have the capacity to review decisions made by inferior adjudicative officers." *Arthrex*, 594 U. S., at 20 (quotation marks omit-

ted).  That is the "almost-universal model of adjudication in the Executive Branch."  *Id.*, at 25 (opinion of ROBERTS, C. J.).  Indeed, the Administrative Procedure Act expressly provides for agency-head review of initial decisions made by Executive Branch adjudicators in 5 U. S. C. §557(b).  And " 'higher-level agency reconsideration' by the agency head is the standard way to maintain political accountability and effective oversight for adjudication that takes place outside the confines of §557(b)."  *Arthrex*, 594 U. S., at 20 (quoting C. Walker & M. Wasserman, The New World of Agency Adjudication, 107 Cal. L. Rev. 141, 157 (2019)); see also *Arthrex*, 594 U. S., at 20 (citing *Freytag* v. *Commissioner*, 501 U. S. 868 (1991)).

The fact that a wide range of administrative law judges and other inferior-officer adjudicators throughout the Executive Branch make independent decisions in the first instance that are only later reviewable by politically accountable superiors reinforces the conclusion that Task Force members, whose function at the very least accords with that practice, are inferior officers.  Under the Appointments Clause, Congress may permissibly provide for an initial "impartial decision by a panel of experts" who are appointed by a department head, followed by a final "transparent decision for which a politically accountable officer must take responsibility."  *Arthrex*, 594 U. S., at 16.  The structure of the Task Force preserves both expertise and accountability.

Finally, even if we perceived ambiguity in how §299b–4(a)(6)'s language regarding independence and freedom from political pressure should be construed, constitutional avoidance would counsel against adopting Braidwood's expansive interpretation.  We should not read the statute in a way that makes the current method of appointment—by the Secretary—unconstitutional if we can reasonably read it otherwise.  We have applied that constitutional-avoidance principle in similar Appointments Clause cases. See, *e. g.*, *Edmond*, 520 U. S., at 658.  As this Court explained in *Ed-*

*mond*, "we must of course avoid" reading the statute "in a manner that would render it clearly unconstitutional" when "there is another reasonable interpretation available." *Ibid.*

An interpretation of § 299b–4(a)(6) under which the Task Force members exercise independent judgment in formulating recommendations, but the Secretary maintains authority to review and block them before they take effect is at the very least a reasonable one. Under that interpretation, the Task Force's operation is akin to the longstanding model of agency adjudications. See *id.*, at 664–665; *Arthrex*, 594 U. S., at 19–20. And that reading avoids making the statute's method of appointment to the Task Force—that is, appointment by the Secretary—unconstitutional. So to steer clear of unconstitutionality, we would adopt that interpretation even if the statute's references to "independent" and "to the extent practicable, not subject to political pressure" created ambiguity as to what powers the Secretary possesses to review and block the Task Force's recommendations. § 299b–4(a)(6).

### 3

Braidwood's third argument is that Task Force members are not inferior officers because, even assuming that the Secretary can review and block recommendations, the Secretary cannot directly compel the Task Force *to make* an "A" or "B" recommendation in the first place.

To begin with, in light of the Secretary's at-will removal power, he could in effect require the Task Force to make certain recommendations—at least in some situations. See § 299b–4(a)(6) (Task Force "not subject to political pressure" but only "to the extent practicable"). Specifically, if the circumstances so warranted, the Secretary could remove and replace members of the Task Force who were unwilling to assign an "A" or "B" recommendation to a particular service.

In any event, even assuming that Braidwood's argument on this point is correct, that would not affect the Task Force members' inferior-officer status.

For one thing, when the Task Force declines to issue an "A" or "B" recommendation, there is less cause for concern about executive officers exercising significant governmental authority without adequate supervision and direction. That is because when the Task Force decides *not* to issue an "A" or "B" recommendation, the Government is not regulating private parties: Health insurers are free to cover or not cover the preventive service at issue as they wish. Congress made that freedom of choice explicit in the statute: "Nothing in this subsection shall be construed to prohibit a plan or issuer from providing coverage for services in addition to those recommended by" the Task Force "or to deny coverage for services that are not recommended by such Task Force." §300gg–13(a).

More fundamentally, this Court has not suggested that a principal officer must be able to compel a subordinate to take an affirmative act affecting private parties in order for the subordinate to qualify as an inferior officer. On the contrary, the Court essentially held the opposite in *Free Enterprise Fund*. There, the Court recognized that the Securities and Exchange Commission lacked the power to require the PCAOB to "start" individual investigations. 561 U. S., at 504. That was no impediment to this Court's concluding that the PCAOB members were inferior officers.

Similarly, in *Edmond*, the Judge Advocate General and Court of Appeals for the Armed Forces could not compel the Coast Guard judges to make a particular decision in the first instance. See 520 U. S., at 664–665. Nor could the Director of the Patent and Trademark Office exercise that kind of power over the patent judges in *Arthrex*. See 594 U. S., at 8–9; *id.*, at 25–26 (opinion of ROBERTS, C. J.). The Coast Guard and patent judges were nonetheless considered inferior officers.

Here, even if the Secretary cannot directly order the Task Force to formulate an "A" or "B" recommendation, that does not undermine the inferior-officer status of the Task Force members.

4

In essence, Braidwood urges this Court to read the relevant statutes as having created an independent agency—the U. S. Preventive Services Task Force—whose members wield unchecked power in making preventive-services recommendations of great consequence for the healthcare and health-insurance industries and the American people more broadly. At oral argument, Braidwood went so far as to assert that, with respect to preventive-services recommendations, the Task Force members are "more powerful than the Secretary of HHS or the President." Tr. of Oral Arg. 101.

It would be odd, however, for this Court to attribute to Congress the intent to create such a powerful independent agency—whose members would therefore require Presidential nomination and Senate confirmation—when the text of the statute says nothing of the sort.

When Congress wants to create an independent agency, it generally does so by explicitly conferring for-cause removal protection on the agency's leadership. See Part II–D–1, *supra*. And Congress usually couples that express for-cause protection from removal with an express statement that those agency heads shall be nominated by the President and confirmed by the Senate. See, *e. g.*, 15 U. S. C. §41 (The Federal Trade Commission "shall be composed of five Commissioners, who shall be appointed by the President, by and with the advice and consent of the Senate"); 42 U. S. C. §7171(b) (The Federal Energy Regulatory Commission "shall be composed of five members appointed by the President, by and with the advice and consent of the Senate"); 49 U. S. C. §1301(b)(1) (The Surface Transportation Board "shall consist of 5 members, to be appointed by the President, by and with the advice and consent of the Senate").

The statute establishing the Task Force contains none of that customary language—either with respect to for-cause removal or appointment by the President with the advice

and consent of the Senate. That silence speaks volumes. Contrary to the argument advanced by Braidwood, we will not judicially construct a powerful new independent agency that Congress and the President did not themselves establish by statute.

## III

Braidwood contends that even if Task Force members are inferior officers, their appointments were nonetheless unconstitutional. Since June 2023, after questions arose about the AHRQ Director's appointment of the Task Force members, the Secretary of HHS has appointed all Task Force members, including by re-appointing those who were already serving. But Braidwood says that the Secretary lacks statutory authority to make appointments to the Task Force, which in turn would create a separate Appointments Clause problem. The dissent advances a version of the same argument.

Under the Appointments Clause, "Congress *may by Law vest* the Appointment of" inferior officers "in the Heads of Departments." Art. II, §2, cl. 2 (emphasis added). According to Braidwood and the dissent, though, Congress has *not* vested the authority to appoint Task Force members in the Secretary of HHS, the relevant Head of Department. Braidwood and the dissent maintain that, given the absence of any statutory authorization for the Secretary to appoint, Task Force members must be appointed by Presidential nomination and Senate confirmation.

We disagree. Congress has, in two steps, expressly vested the Secretary of HHS with the authority to appoint Task Force members. *First*, in 1999, when Congress codified the Task Force, Congress authorized the Director of the Agency for Healthcare Research and Quality (AHRQ) to appoint members of the Task Force. *Second*, Reorganization Plan No. 3 of 1966 transfers all of the AHRQ Director's functions to the Secretary. Congress ratified that Reorganiza-

tion Plan in 1984. So in 1999, when Congress gave the AHRQ Director the authority to appoint Task Force members, that authority vested in the Secretary.

Beginning in June 2023, the Secretary has exercised that statutory authority to appoint the Task Force members. Therefore, since June 2023, all Task Force members (including the ones who already held office as of that date) have been appointed by the Secretary of HHS pursuant to a law enacted by Congress—and thus they have been appointed in a manner consistent with the "Congress may by Law vest" requirement of the Appointments Clause. Art. II, § 2, cl. 2.

## A

### 1

The statute governing the Task Force, as originally enacted in 1999 and amended in 2010, authorizes the AHRQ Director to appoint the Task Force members. See § 915, 113 Stat. 1659; 124 Stat. 541–542. That statute provides that the Director "shall convene" a Task Force "to be composed of individuals with appropriate expertise." 42 U. S. C. § 299b–4(a)(1).

To be sure, the statute does not use the term "appoint." But Congress need not use magic words to confer appointment authority. Around the time of the Founding, "the verb 'appoint'" was synonymous with "'allot, assign, or designate.'" *NLRB* v. *SW General, Inc.*, 580 U. S. 288, 312–313 (2017) (THOMAS, J., concurring) (quoting 1 N. Webster, An American Dictionary of the English Language 11–12 (1828)); see *Al Bahlul* v. *United States*, 967 F. 3d 858, 863, 873–874 (CADC 2020) (holding that statute permitting the Secretary of Defense to "designate" an officer responsible for convening military commissions vested the Secretary with authority to "appoint" the convening officer (quoting 10 U. S. C. § 948h)); *post*, at 804 (opinion of THOMAS, J.) (A "statute giving" a department head "authority to *assign* a person" to an office satisfies the Appointments Clause (emphasis added)).

Depending on context, other terms like "direct" that are perhaps less obviously synonymous with "appoint" may also suffice to confer appointment authority—and that may be so even if the same statute uses the term "appoint" with respect to other officers. See *SW General, Inc.*, 580 U. S., at 312 (THOMAS, J., concurring) (concluding that when the President " 'direct[s]' " someone to " 'perform the functions and duties' " of an office temporarily, "he is 'appoint[ing]' that person as an 'officer of the United States' within the meaning of the Appointments Clause" even though the statute refers to "appointment[s]" to the same offices, 5 U. S. C. §3345).

More to the point, the AHRQ Director's power to "convene" is naturally read to include the power to appoint in this specific context. Of course, "convene" in the abstract could mean to merely "call together" or "assemble." Supp. Brief for Respondents 4 (quotation marks omitted). But where as here there is no separate statutory provision specifying who is to appoint the individuals to be called together or assembled, the obvious conclusion is that the person with the power to convene is also the person with the power to appoint. That is especially so when the person charged with convening is required to ensure that members of the body to be convened meet certain qualifications, such as "appropriate expertise." §299b–4(a)(1).

Congress has elsewhere used the term "convene" to authorize an official to both assemble a body and select its members. For example, 10 U. S. C. §948h states: "Military commissions under this chapter may be convened by the Secretary of Defense or by any officer or official of the United States designated by the Secretary for that purpose." That statute contains no provision using the term "appoint." Therefore, §948h—along with a neighboring provision that also uses a term other than "appoint" (namely, "detail")—has been read to authorize the Secretary of Defense or his designee to appoint commission members. See *Al Bahlul*, 967 F. 3d, at 863–864; see also §948i(b) ("When convening a mili-

Page Proof Pending Publication

tary commission under this chapter, the convening authority shall detail" eligible "members of the armed forces"); see also, *e. g.*, 10 U. S. C. § 14903(a) ("The Secretary of the military department concerned shall convene a board of inquiry" to "be composed of not less than three officers" with specified "qualifications"); 14 U. S. C. § 3703(a) ("The Secretary shall convene a Coast Guard Reserve Policy Board," and at "least one-half of the members of the Board shall be Reserve officers"); 33 U. S. C. § 3022(a) (The Secretary of Commerce "shall convene a personnel board" which "shall consist of not less than five officers" of a certain "grade").

On the flip side, when Congress wants to decouple the power to convene from the power to appoint, it has done so explicitly. Consider 15 U. S. C. § 634c(b)(2)(A), which provides that "the Chief Counsel for Advocacy" within the Small Business Administration "shall convene an Interagency Working Group" but then states that the Working Group shall be composed of representatives from particular agencies "as selected by the head of the agency." See also, *e. g.*, 20 U. S. C. §§ 107d–2(a), (b) (The Secretary of Education "shall convene an ad hoc arbitration panel" with three members "appointed" by others); 50 U. S. C. §§ 3022(b), (d) (2018 ed., Supp. II) ("The Director of National Intelligence shall convene meetings of the Joint Intelligence Community Council" with membership of the Council specified in the law itself).

The statute setting up the Task Force is more like the former set of statutes than the latter. So in context, the AHRQ Director's power to "convene" naturally encompasses the power to appoint.

Not surprisingly, the Executive Branch's actions for the last 26 years, since the 1999 codification of the Task Force, have reflected that straightforward interpretation of the statute—without any apparent objection from Congress. For those 26 years, the relevant government actors have always read the authorization to "convene" the Task Force to

include the power to appoint the Task Force members. That considered and consistent Executive Branch practice—which began contemporaneously with enactment of the statute codifying the Task Force in 1999—buttresses the ordinary meaning and natural interpretation of the term "convene" in the statute. See *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 394 (2024); see also *Bondi* v. *VanDerStok*, 604 U. S. 458, 480–481 (2025).

2

Of course, if the statute vested the power to appoint Task Force members in the AHRQ Director alone, a constitutional problem would exist. Not in 1999 when the "convene" provision was enacted and the Task Force's recommendations were still advisory—at that point, the Task Force members were mere employees who could be appointed by the AHRQ Director. But there would be a problem beginning in 2010 after the Affordable Care Act was enacted. Starting then, the Task Force's "A" and "B" recommendations were no longer merely advisory. Rather, health insurers had to begin covering those recommended services at no cost to the insured. So after the Affordable Care Act, the Task Force members were officers, not just employees. And as inferior officers, they could be appointed by the Secretary, who is a Head of Department, but not by the AHRQ Director. In short, since 2010, the Appointments Clause has required that the Task Force members be appointed by the Secretary of HHS.

As the Government explains, however, Congress itself solved the potential constitutional issue that arose in 2010. See Supp. Brief for United States 5. Specifically, Reorganization Plan No. 3 of 1966, which was ratified by Congress in 1984, transfers all authority of the AHRQ Director to the Secretary. So under Reorganization Plan No. 3, the AHRQ Director's power to appoint the Task Force members was transferred to the Secretary. That means the Secretary

possesses the authority to appoint the Task Force members. And the Secretary has exercised that appointment authority.

To explain the background a bit more fully: The Reorganization Act of 1949 charged the President with examining "the organization of all agencies of the Government."   § 2(a), 63 Stat. 203.   That Act authorized the President to prepare reorganization plans when he determined that "the transfer of the whole or any part of any agency" or its "functions" "to the jurisdiction and control of any other agency" was necessary.   § 3, *id.*, at 203; see *id.*, at 204.

In 1966, acting pursuant to the 1949 Act, President Lyndon Johnson issued Reorganization Plan No. 3.   Before 1966, the Public Health Service was separate from the Department of Health and Human Services, then known as the Department of Health, Education, and Welfare (HEW).   See Public Papers of the Presidents, Lyndon B. Johnson, Vol. I, Apr. 25, 1966, p. 455 (1967).   But in 1966, Reorganization Plan No. 3 transferred to the Secretary of HHS (then HEW) "all functions of the Public Health Service" and its "officers and employees" as well as "all functions of all agencies of or in the Public Health Service."   80 Stat. 1610.

In 1984, Congress passed and President Reagan signed legislation that ratified and affirmed Reorganization Plan No. 3 "as law."   98 Stat. 2705.

The AHRQ is an agency "of or in the Public Health Service," and the AHRQ Director is an "officer" of the Public Health Service.   80 Stat. 1610; see 42 U. S. C. § 299(a).   So Reorganization Plan No. 3 "transfer[s]" all of the AHRQ Director's functions to the Secretary of HHS.   80 Stat. 1610. As the Government stated at oral argument here, under Reorganization Plan No. 3, "all of the Director's powers are the Secretary's powers."   Tr. of Oral Arg. 110.

After statutory codification of the Task Force in 1999, those powers of the Secretary included the AHRQ Director's power to appoint the Task Force members.   Therefore, by virtue of the 1984 Act ratifying Reorganization Plan No. 3

and the 1999 Act conferring appointment authority, Congress vested the power to appoint Task Force members in the Secretary of HHS.[6]

To be sure, Congress could have vested the Secretary with appointment authority in more direct ways. But given that the Appointments Clause question arose only in 2010 when the Task Force recommendations became binding and Task Force members became officers under the Affordable Care Act, it is no surprise that the 1999 statute did not expressly name the Secretary.

Moreover, this Court has upheld as consistent with the Appointments Clause statutory schemes that less directly vest appointment authority in the Head of Department. For example, in *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*, the Court stated that it had "previously found that the department head's approval" of an inferior officer's appointment of another inferior officer "satisfies the Appointments Clause." 561 U. S. 477, 512, n. 13 (2010). For that proposition, the Court cited with approval *United States* v. *Hartwell*, 6 Wall. 385 (1868). In *Hartwell*, the Court considered a statute that authorized "the assistant treasurer, at Boston, with the approbation of the Secretary of the Treasury, to appoint a specified number of clerks." *Id.*, at 393 (citing Act of July 23, 1866, 14 Stat. 202). The *Hartwell* Court explicitly blessed that arrangement, holding that the clerks were "appointed by the head of a department within the meaning of the constitutional provision." 6 Wall., at 393–394.

---

[6] That is not to say that the Secretary must personally perform every function assigned by Congress to the Public Health Service and transferred to the Secretary by operation of Reorganization Plan No. 3. With respect to most functions, the Secretary may delegate responsibility to carry out the function back to the Public Health Service. See § 2, 80 Stat. 1610. But where the Constitution requires that the Secretary personally perform a particular function, like appointing the Task Force members, delegation is not an option.

The appointment scheme at issue in this case more clearly vests appointment authority in the department head (the Secretary of HHS) than did the statute in *Hartwell*, the validity of which the Court affirmed in *Free Enterprise Fund*. See 561 U. S., at 512, n. 13 (citing 6 Wall., at 393–394). In *Hartwell*, the Secretary could only approve or disapprove appointments proposed and carried out by the assistant treasurer. So the assistant treasurer could frustrate the Secretary's ability to appoint clerks of his choosing simply by refusing to propose their appointment. Nonetheless, the Court concluded that the statute vested authority to appoint the clerks in the Secretary. Here, Reorganization Plan No. 3 grants the Secretary the power to stand in the shoes of the AHRQ Director and himself appoint the Task Force members—far more direct appointment authority than existed in *Hartwell*.

### B

Braidwood and the dissent push back against the conclusion that Congress has by law vested the Secretary with appointment authority. They argue that the statute governing the Task Force actually does not grant appointment authority to the AHRQ Director. And they contend that even assuming that it does so, no statute "vests" such authority in the Secretary.

### 1

Braidwood first asserts that the 1999 statute codifying the Task Force simply says "convene" and is therefore actually "agnostic" about who should *appoint* the Task Force members. Brief for Respondents 22; see Tr. of Oral Arg. 59–61. In other words, Braidwood claims that "Congress has not 'vested' the appointment of the Task Force in *anyone*." Supp. Brief for Respondents 1 (emphasis added). As Braidwood sees it, Congress did not care—either in 1999 when it codified the Task Force or in 2010 when it made the Task Force's recommendations legally binding—whether the Task

Force members are appointed by the AHRQ Director, the Secretary of HHS, the President, the Secretary of Energy, a private party, or anyone else. See Tr. of Oral Arg. 59. And Braidwood detects no problem with a statute under which multiple different officials or entities could all purport to appoint members of the Task Force. Braidwood suggests that the AHRQ Director, the Secretary of HHS, or the President could simply step in to announce which collection of individuals is the "real" Task Force. See Supp. Brief for Respondents 5, n. 5.

We will not read the statute to usher in such a bizarre and half-baked scheme. It is implausible to conclude that Congress in 1999 established the Task Force and in 2010 charged its members with making legally binding healthcare recommendations—but was entirely indifferent as to who would appoint those members. Tellingly, Braidwood has failed to identify *any* other statute that establishes a government entity but is entirely agnostic about who will select the members of that government entity. The far more sensible reading of the Task Force statute is the Government's: that in 1999, in authorizing the AHRQ Director to "convene" a Task Force composed of members with "appropriate expertise," Congress also charged the Director with selecting those members. Supp. Brief for United States 2–3 (quoting §299b–4(a)(1)).

The dissent, for its part, cannot bring itself to endorse Braidwood's farfetched theory. But it nonetheless asserts that we should not read "convene" to mean "appoint" because the Appointments Clause supplies a default rule for how inferior officers should be appointed: by the President with Senate confirmation. But §299b–4(a)(1), together with Reorganization Plan No. 3 of 1966 as ratified by Congress in 1984, expressly vests appointment authority in the Secretary and therefore displaces any such default rule.

The dissent all but concedes that between 1999 and 2010—before the Task Force members were officers and therefore

before the Appointments Clause was relevant—the statutory authorization to "convene" was best read to confer appointment authority.   See *post*, at 816; see also *post*, at 815 (When "no other provision addresses how the group's members are named because the Appointments Clause does not apply," the "authority to 'convene'" confers appointment authority). But according to the dissent, the meaning of the statute suddenly changed in 2010 after the enactment of the Affordable Care Act.   The problem with that theory is that the relevant statutory text *did not* change in 2010.   Both before and after the enactment of the Affordable Care Act, the statute has granted authority to "convene" a Task Force "composed of individuals with appropriate expertise."   § 299b–4(a)(1); § 299b–4(a)(1) (2006 ed.).   So in effect, the dissent reads the same words to mean different things before and after 2010.

2

Braidwood and the dissent next argue that, even if the AHRQ Director's statutory authority to "convene" carries with it the power to appoint, Reorganization Plan No. 3 does not actually transfer the Director's appointment authority to the Secretary and thus does not vest appointment authority in the Secretary.

*First*, Braidwood and the dissent emphasize that Reorganization Plan No. 3 is not a "law" at all.   They note that the Plan was originally submitted to Congress in 1966 by President Johnson and took effect only because neither House of Congress passed a disapproval resolution within 60 days.

True but irrelevant.   In a 1984 Act passed by Congress and signed by President Reagan—an Act that therefore indisputably qualifies as a "law"—Congress stated that it "hereby ratifies and affirms as law each reorganization plan" previously enacted, including Reorganization Plan No. 3 of 1966.   98 Stat. 2705.

*Second*, Braidwood and the dissent point out that Congress did not codify the Task Force or the authority to appoint Task Force members until 1999. And they claim that Reorganization Plan No. 3 transferred to the Secretary only those functions that existed as of 1966. But that frozen-in-time reading of Reorganization Plan No. 3 finds no footing in either the statutory text or common sense.

Starting with the text, Reorganization Plan No. 3 transfers to the Secretary "*all* functions" of the Public Health Service and its officers. 80 Stat. 1610 (emphasis added). That most naturally means an ongoing transfer of authority—that is, any new powers granted to the Public Health Service and its officers by Congress after 1966 would be transferred to the Secretary, in addition to those powers existing as of 1966. Moreover, the Dictionary Act provides that, "unless the context indicates otherwise," "words used in the present tense include the future as well as the present." 1 U. S. C. §1. Reorganization Plan No. 3 speaks in the present tense, providing that "all functions" "*are* hereby transferred." 80 Stat. 1610 (emphasis added). The use of the present tense combined with the expansive phrase "all functions" shows that Congress intended that Reorganization Plan No. 3 effect a continuing transfer of functions from the Public Health Service to the Secretary.

Braidwood and the dissent both lean on a provision of the Reorganization Act of 1949 stating that no "reorganization plan shall provide for, and no reorganization under this Act shall have the effect of . . . authorizing any agency to exercise any function which is not expressly authorized by law at the time the plan is transmitted to the Congress." 63 Stat. 205. But that language merely prevented "the President, under the guise of consolidating and rearranging, from actually creating authority in the Executive Branch which had not existed before." Dept. of Justice, Office of Legal Counsel, Memorandum of William H. Rehnquist, Assistant Atty. Gen.

(Sept. 11, 1969), in Reorganization Plan No. 1 of 1969 (ICC): Hearing before the Subcommittee on Executive Reorganization of the Senate Committee on Government Operations, 91st Cong., 1st Sess., 29 (1969). In other words, that provision barred *the President* from seizing on a reorganization plan to unilaterally confer new powers on an agency.

But that provision in no way barred *Congress* from later enacting a law that conferred new powers on an agency subject to a reorganization plan. That is precisely what Congress did in 1999 when it codified the Task Force and granted the AHRQ Director authority to appoint the Task Force members. At that point, the AHRQ Director's authority to appoint Task Force members became one of the "functions" transferred to the Secretary. 80 Stat. 1610.

Reading Reorganization Plan No. 3 to provide for only a one-time transfer of functions in 1966 and thereby freeze in time the relationship between the Public Health Service and the Secretary of HHS would also produce untenable—bordering on absurd—results from the standpoint of the agency's practical operations. It would mean that all functions of the Public Health Service statutorily conferred on the Service through 1966 would rest with the Secretary, but any functions statutorily conferred on it after the 1966 Plan became effective would fall outside of the Secretary's purview. There is no good or plausible reason to think that Congress created such an "arbitrary bifurcation." Supp. Brief for United States 6.

To the extent it may be relevant, the then-Secretary of HEW explained to Congress in 1966 that one objective of Reorganization Plan No. 3 was to vest all of the Public Health Service's current and future functions in the Secretary so that he would have the "flexibility" "to reorganize" the Service—then and "at any future time"—"as the requirements of the times demand." Reorganization Plan No. 3 of 1966 (Public Health Service): Hearing before a Subcommittee

of the House Committee on Government Operations, 89th Cong., 2d Sess., 7 (1966).  If the Secretary were vested with only the functions of the Public Health Service that existed as of 1966, he would lack the flexibility to reorganize the Service as public health needs evolved and as Congress correspondingly conferred new powers upon the Service.

*Third*, the dissent spins out a new theory of its own, positing that Reorganization Plan No. 3 of 1966 could not have transferred the AHRQ Director's functions to the Secretary because otherwise the Director would be an "empty husk." *Post*, at 819.  But as the Government explains, the text of Reorganization Plan No. 3 of 1966 is plain: It explicitly states that it " 'transfer[s]' " " 'all functions' " of " 'officers' " of the Public Health Service, including the AHRQ Director, " 'to the Secretary.' "  Supp. Brief for United States 5 (quoting 80 Stat. 1610).  And after that statutory transfer, the officers of the Public Health Service are not "empty husks" because the Secretary may delegate responsibility to carry out functions back to the Public Health Service and its officers.  See n. 6, *supra*.  Section 2 of Reorganization Plan No. 3 expressly provides for such delegation: It states that the "Secretary may from time to time make such provisions as he shall deem appropriate authorizing the performance of any of the functions transferred to him by the provisions of this reorganization plan by any officer, employee, or agency of the Public Health Service."  80 Stat. 1610.  And the Secretary has in fact delegated functions back to the Public Health Service.  See, *e. g.*, 31 Fed. Reg. 8964 (1966); 33 Fed. Reg. 5426 (1968); 53 Fed. Reg. 3457 (1988); 61 Fed. Reg. 29566 (1996).

So it is not correct, either in statutory text or in actual practice, that the Reorganization Plan left the officers of the Public Health Service as "empty husks."

In sum, Braidwood's and the dissent's arguments on the vesting issue fall flat.  Read in context, two laws taken together—Reorganization Plan No. 3 of 1966 as ratified by the

1984 Act; and the 1999 statute conferring appointment authority—expressly vest the Secretary with authority to appoint the Task Force members.[7]

3

Braidwood's and the dissent's arguments that Congress has not properly vested the Secretary with authority to appoint Task Force members fail on their own terms. But if there were any doubt on that score, the canon of constitutional avoidance as applied in this Court's prior Appointments Clause cases would again dispel it.

*Edmond* v. *United States* is instructive. 520 U. S. 651 (1997). There, the challengers argued that Congress gave the power to appoint judges of the Coast Guard Court of Criminal Appeals to the Judge Advocate General. But because the Judge Advocate General was not a Head of Department, it would have been unconstitutional for Congress to vest appointment authority in the Judge Advocate General alone. Rather than read the statute "in a manner that would render it clearly unconstitutional," the Court adopted a "reasonable" alternative reading: It interpreted the statutory scheme to vest appointment authority in the Secretary of Transportation. *Id.,* at 658.

Here, reading the statutes at issue to vest appointment authority in the AHRQ Director alone would likewise render them "clearly unconstitutional." *Ibid.* Meanwhile, it is at a minimum "reasonable" to read Reorganization Plan No. 3 to have transferred the AHRQ Director's appointment power to the Secretary, such that the statutes together vest the

---

[7] Even if the statutes vested appointment authority in *both* the Secretary and the AHRQ Director, the Government says (and Braidwood agreed, at least at oral argument) that such a structure would not raise constitutional concerns so long as the Secretary was the one to actually make the appointments—as has been the case since June 2023. See Supp. Brief for United States 7; Tr. of Oral Arg. 67–70, 111.

Secretary with authority to appoint the members of the Task Force.   *Ibid.*

C

Not only has Congress vested authority to appoint the Task Force members in the Secretary of HHS, the Secretary has now in fact exercised that authority.   The Task Force members have been inferior officers since 2010 when the Affordable Care Act was enacted.   Until June 2023, the Task Force members were appointed by the AHRQ Director alone, not by the Secretary.   Then in June 2023, after litigation belatedly alerted the Government to the fact that Task Force members had become officers, the Secretary both ratified the Director's previous appointments of the Task Force members and also re-appointed them (a sequence of events that similarly occurred in *Edmond*).   The Secretary has continued to appoint members of the Task Force, including all current members.

The fact that the Secretary did not begin personally appointing the Task Force members until June 2023 is irrelevant to whether the Task Force members appointed by the Secretary have been properly appointed.   In *Edmond*, the Secretary of Transportation had not historically appointed the Coast Guard judges.   After Appointments Clause challenges arose in litigation, the Secretary "issued a memorandum 'adopting'" the Judge Advocate General's appointments as his own.   *Id.*, at 654.   Those developments did not prevent the Court from concluding that the Coast Guard judges were properly appointed.   The same is true here.

*          *          *

To sum up: Task Force members issue preventive-services recommendations of critical importance to patients, doctors, insurers, employers, healthcare organizations, and the American people more broadly.   In doing so, however, the Task Force members remain subject to the Secretary of HHS's

supervision and direction, and the Secretary remains subject to the President's supervision and direction.  So under Article II and this Court's precedents, Task Force members are inferior officers, and Congress may vest the power to appoint them in the Secretary of HHS.  Congress has done so, and the Secretary has appointed the Task Force members pursuant to that grant of authority.

Therefore, the Task Force members' appointments are fully consistent with the Appointments Clause in Article II of the Constitution.  The structure of the Task Force and the manner of appointing its officers preserve the chain of political accountability that was central to the Framers' design of the Appointments Clause: The Task Force members were appointed by and are supervised and directed by the Secretary of HHS.  And the Secretary of HHS, in turn, answers to the President of the United States.

We reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE ALITO and JUSTICE GORSUCH join, dissenting.

To promote democratic accountability, the Appointments Clause establishes a default rule that all Executive Branch officers must be appointed by the President with the Senate's approval.  Art. II, §2, cl. 2.  Congress may depart from this default by authorizing a department head to appoint "inferior Officers"—but only if it does so expressly.  *Ibid.*

This case concerns the U. S. Preventive Services Task Force, a body that issues legally binding recommendations regarding preventive healthcare treatments.  At the beginning of this suit, a subordinate official within the Department of Health and Human Services (HHS) had for years appointed the Task Force's members.  Everyone now agrees

Thomas, J., dissenting

that this practice was unlawful.  Everyone further agrees
that no one statute provides for a department head to ap-
point the Task Force's members.  But, rather than accept
that the default mode of appointment applies, the Govern-
ment invented a new theory on appeal, arguing that the com-
bination of two ambiguously worded statutes enacted dec-
ades apart establishes that the Secretary of HHS can
appoint the Task Force's members.

The Court today rushes to embrace this theory.   I cannot.
To begin with, I would not rule on the Government's new
theory before any lower court has done so.   But, if we are
to decide this question now, I do not see how Congress has
spoken with the clarity needed to depart from the default
rule established by the Appointments Clause.  In ruling
otherwise, the Court treats the default rule as an inconve-
nient obstacle to be overcome, not a constitutional principle
to be honored.  And, it distorts Congress's design for the
Task Force, changing it from an independent body that re-
ports directly to the President to one subject to the control
of the Secretary of HHS.

I

A

The Appointments Clause provides that the President
"shall nominate, and by and with the Advice and Consent
of the Senate," appoint all "Officers of the United States."
Art. II, §2, cl. 2.   But, "the Congress may by Law vest the
Appointment of such inferior Officers, as they think proper,
in the President alone, in the Courts of Law, or in the Heads
of Departments."  *Ibid.*

The Clause prescribes the exclusive means of appointing
"'Officers of the United States.'"  *Lucia* v. *SEC*, 585 U. S.
237, 244 (2018).   Officers are Government officials who exer-
cise "'significant'" federal authority on an "ongoing" basis.
*Id.*, at 245–246.   Those who do not exercise such authority

are mere nonofficer employees and are not subject to the Clause's requirements. *Id.*, at 245.[1]

The Appointments Clause classifies officers as either "inferior" or noninferior. Noninferior officers, called "principal" officers in our case law, must be appointed by the President with the Senate's advice and consent. Inferior officers by "default" must be appointed in the same manner. *Edmond* v. *United States*, 520 U. S. 651, 660 (1997). But, Congress may depart from the default by conferring the appointment power on the President alone, a department head, or the courts. A principal officer in the Executive Branch is one who has no "superior" other than the President. See *id.*, at 662. An inferior officer is one "whose work is directed and supervised at some level by" a principal officer. *Id.*, at 663.

The Appointments Clause serves several purposes. It protects the President's control over the Executive Branch by providing that only the President or a department head under his control may appoint executive officers.[2] At the same time, it checks the President's power by requiring him

---

[1] The parties agree that the exercise of "significant authority" marks the dividing line between officers and nonofficer employees. Brief for Petitioners 2 (internal quotation marks omitted); Brief for Respondents 4–5. I will assume that this view is correct for purposes of this opinion. But see *Lucia*, 585 U. S., at 254 (THOMAS, J., concurring) ("The Founders likely understood the term 'Officers of the United States' to encompass all federal civil officials who perform an ongoing, statutory duty—no matter how important or significant the duty").

[2] Although this Court has held that Congress may sometimes vest the courts with the power to appoint inferior executive officers, *Morrison* v. *Olson*, 487 U. S. 654, 673–677 (1988), I doubt that such "inter-branch" appointments are consistent with the original understanding of the separation of powers. See *In re Sealed Case*, 838 F. 2d 476, 489–496 (CADC 1988) (Silberman, J.). In any event, the Appointments Clause at a minimum prevents Congress from vesting the appointment power *in itself*, as many preframing state legislatures did. See *Freytag* v. *Commissioner*, 501 U. S. 868, 904, n. 4 (1991) (Scalia, J., concurring in part and concurring in judgment).

to nominate principal officers personally and to obtain the Senate's consent. These requirements ensure that the selection of officers is a public matter in which the President must justify "the propriety of his choice." The Federalist No. 76, p. 457 (C. Rossiter ed. 1961) (A. Hamilton).

With respect to inferior officers, the Appointments Clause balances efficiency and accountability. The "obvious purpose" of allowing appointment by the President alone or a department head is "administrative convenience." *Edmond*, 520 U. S., at 660. But, even with this allowance, the Clause still imposes significant constraints. The Clause permits a more informal method of appointment only when Congress affirmatively chooses one, and Congress has retained the default of requiring Senate confirmation in many cases where it is not constitutionally required.[3] Moreover, even when Congress chooses to depart from the default rule, it can vest the appointment power no more than one rung below the President in the executive hierarchy. See *id.*, at 658. By preventing lower level officials from appointing officers, the Appointments Clause ensures that officer selection remains visible "to the public eye." The Federalist No. 77, at 461 (A. Hamilton).

B

The Preventive Services Task Force is an "independent panel" of nationally recognized medical experts charged with making evidence-based recommendations about preventive healthcare services. App. 37. Its 16 members are physi-

_____

[3] To give just a few examples, there are 14 Senate-confirmed positions in HHS besides its head, the Secretary. See Senate Committee on Homeland Security and Governmental Affairs, Policy and Supporting Positions, 118th Cong., 2d Sess., 62–70 (Comm. Print 2024). All 93 U. S. Attorneys, who are subordinate to the Attorney General, likewise are appointed only by the President with Senate confirmation. 28 U. S. C. §541(a). And, the Senate confirms tens of thousands of military officers each year. See, *e. g.*, 170 Cong. Rec. D512 (May 16, 2024).

cians and researchers in the fields of preventive medicine and primary care. They work on a volunteer basis and receive no compensation for their service.

The Task Force reviews preventive services for their medical efficacy and cost effectiveness. It assigns letter grades to services, ranging from "A" to "D." "A" represents a high certainty of a substantial net benefit, and "D" represents a moderate or high certainty of no net benefit. The Task Force may alternatively issue an "I" grade if there is insufficient evidence to assess the balance of a service's benefits and harms.

HHS officials first commissioned the Task Force in 1984 to serve as a purely advisory body. In 1995, the Agency for Healthcare Research and Quality (AHRQ) assumed "responsibility" for the Task Force. 63 Fed. Reg. 880 (1998). AHRQ is part of the Public Health Service, a collection of agencies within HHS. 42 U. S. C. §203. The Agency is headed by a Director, who is appointed by the Secretary of HHS. §299(a). The Director thus became responsible for naming the Task Force's members and calling its meetings. See 63 Fed. Reg. 879–880.

Congress codified AHRQ's responsibility for the Task Force in 1999. 113 Stat. 1659–1660. It provided that the Director "may periodically convene a Preventive Services Task Force to be composed of individuals with appropriate expertise." 42 U. S. C. §299b–4(a)(1) (2000 ed.).

The character of the Task Force fundamentally changed in 2010, when Congress passed the Affordable Care Act (ACA). The ACA transformed the Task Force from a purely advisory body into one whose recommendations carry the force of law. Specifically, the ACA requires health-insurance issuers and group health plans to cover preventive services for which the Task Force has issued an "A" or "B" recommendation without imposing copayments, deductibles, or other cost-sharing charges on patients. 42 U. S. C. §300gg–13(a)(1). The ACA also replaced the 1999 version of §299b–4(a)(1) with a new

version providing that the AHRQ "Director shall convene an independent Preventive Services Task Force." It further provided that Task Force members and their recommendations "shall be independent and, to the extent practicable, not subject to political pressure." §299b–4(a)(6). Following this enactment, the AHRQ Director continued to appoint Task Force members.

C

In 2020, four individuals and two businesses who objected to covering certain preventive treatments sued the Secretary of HHS and other Government defendants, arguing that the Task Force's members were invalidly appointed under the Appointments Clause. The parties cross-moved for summary judgment, with the Government arguing that the Task Force's members are not officers under the Clause because they are outside experts who do not exercise significant governmental authority.

The District Court granted summary judgment for the challengers. *Braidwood Mgmt. Inc* v. *Becerra*, 627 F. Supp. 3d 624 (ND Tex. 2022). The court first held that the Task Force's members have been officers since 2010, because the ACA made their recommendations legally binding. It then held that the Task Force's members had been invalidly appointed for two independent reasons. First, because no other officers supervise the Task Force's issuance of recommendations, its members were principal officers who had to be appointed by the President with Senate confirmation. Second, even if the Task Force members were inferior officers, the AHRQ Director could not appoint them because, as an officer subordinate to the Secretary of HHS, the Director is not a department head. The District Court issued an injunction prohibiting enforcement of the Task Force's recommendations. *Braidwood Mgmt. Inc* v. *Becerra*, 666 F. Supp. 3d 613 (ND Tex. 2023).

The Government did not defend its original theory on appeal. Instead, it argued for the first time that the Task

Force's members are officers, but only inferior ones subordinate to the Secretary of HHS. And, while briefing was ongoing, the Secretary purported to appoint the Task Force members. By that act, the Government argued, the members now lawfully held their offices, because Congress had vested the appointment of the Task Force's members in the Secretary. The Government derived this purported appointment authority from the *combination* of two statutes, enacted decades apart. First, §299b–4(a)(1) gave the AHRQ Director the power to "convene" the Task Force, which the Government read to include appointing its members. Second, a statute called Reorganization Plan No. 3 of 1966, 80 Stat. 1610 (Reorganization Plan), "transferred" to the Secretary "all functions" of all officers of the Public Health Service, including AHRQ. In addition to claiming to appoint the members, the Secretary issued an order purporting to ratify all the recommendations that the Task Force had issued from 2010 to 2022, when its members had been unlawfully appointed by the AHRQ Director.

The challengers opposed the Government's new theory. They contended that the Director's convening power does not include the power to appoint, and that this power is in any event not one of the functions transferred by the Reorganization Plan. The challengers also maintained that the Task Force members were principal officers who had to be appointed by the President with Senate confirmation.

The Fifth Circuit affirmed in relevant part. *Braidwood Mgmt., Inc.* v. *Becerra*, 104 F. 4th 930 (2024). The court assumed without deciding that the Secretary had the statutory power to appoint the Task Force. It then held that Task Force members are principal officers. The court acknowledged that, if the Secretary has the authority to appoint the Task Force's members, he would thereby have the authority to remove them at will, giving him a powerful mechanism for *de facto* control. But, that control was insufficient to make the Task Force inferior officers, the court concluded,

because the Secretary has no authority to exercise direct review or supervision over the Task Force's issuance of recommendations. Rather, the statutory scheme "contemplates complete autonomy" for the Task Force. *Id.*, at 944. The court then held that the Secretary's purported ratification was invalid because the Secretary has no authority to "review, revise, or issue the preventive-care recommendations himself." *Id.*, at 948.

The Government asked this Court to decide whether the structure of the Task Force violates the Appointments Clause. We granted certiorari. 604 U. S. 1073 (2025).

## II

I would remand for the Fifth Circuit to consider the important threshold question that it skipped: whether the Secretary has the statutory power to appoint the Task Force. The Secretary may appoint the Task Force's members only if (1) Congress has vested in the Secretary the power to appoint them, and (2) the members are inferior officers under the Appointments Clause. The answer to the first question significantly affects the analysis of the second question. But, no court has passed on the first question, and this Court has had only a limited opportunity to consider it.

We should resolve the statutory challenge to the Secretary's appointment authority before addressing the constitutional challenge. Due respect for Congress as a coordinate branch of Government usually demands that we refrain from calling the constitutionality of its enactments into question "'unless absolutely necessary to a decision of the case.'" *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring). Accordingly, before "'reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.'" *Jean* v. *Nelson*, 472 U. S. 846, 854 (1985); see *Edmond*, 520 U. S., at 655–656 (considering the petitioner's statutory challenge to an officer's appointment before his constitutional challenge).

That rule applies with special force here because the statutory question logically precedes the constitutional question. The Task Force's members are inferior officers if their "work is directed and supervised at some level" by the Secretary. *Id.*, at 663. To determine whether that is the case, our precedents instruct us to consider (1) whether the Secretary can remove them at will and (2) whether the Secretary can directly review or command their actions. See *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 510 (2010). Whether the Secretary appoints the Task Force's members affects both these inquiries. Absent a statutory provision to the contrary, "the power of removal" is "incident to the power of appointment." *Ex parte Hennen*, 13 Pet. 230, 233 (1839). And, if the Secretary has the statutory power to appoint, we will also be more likely to conclude that he has the power to direct the Task Force and review their decisions. After all, if the Secretary appoints the Task Force, it must be subject to his supervision to be constitutionally structured. Under the canon of constitutional avoidance, we would therefore *have to* interpret the statutes governing the Task Force to permit secretarial supervision if it is "fairly possible" to do so. *United States* v. *Jin Fuey Moy*, 241 U. S. 394, 401 (1916). In contrast, if Congress never gave the Secretary the appointment power, it makes no constitutional difference whether the Task Force answers to the Secretary or to the President alone. We would have no reason to put a thumb on the scale in favor of secretarial supervision.[4]

---

[4] Whether the Secretary has statutory appointment authority may also affect the appropriate remedy for an unlawful appointment. This Court's "severability" doctrine directs that, when a court finds " 'a constitutional flaw in a statute,' " it should "seve[r] any 'problematic portions while leaving the remainder intact,' " unless the court can divine that Congress "would have preferred" the statute's wholesale invalidation. *Free Enterprise Fund*, 561 U. S., at 508–509. Thus, when Congress unconstitutionally vests the power to appoint a principal officer in a department head, this Court will ask whether it is possible to save the appointment by "sev-

The Fifth Circuit did not follow the standard order of operations. It skipped over whether Congress had vested the appointment of the Task Force's members in the Secretary and instead held that, even assuming that Congress had, the Task Force members are principal officers not subject to the Secretary's supervision. Because the Fifth Circuit should have decided the statutory question before the constitutional one, I would vacate and remand for it to do so. See *Massachusetts* v. *Westcott*, 431 U. S. 322, 323 (1977) (*per curiam*).[5] It is not our "usual practice" to decide important legal questions in the first instance. *CRST Van Expedited, Inc.* v. *EEOC*, 578 U. S. 419, 435 (2016). Deviating from standard practice is particularly unwise here, where the Government first developed its statutory theory on appeal and the parties have only minimally addressed the question in their principal briefs. But, because the majority insists on deciding the statutory question now, see *ante*, at 779–793, so will I.

---

ering" the provisions that insulate the officer from supervision. See *United States* v. *Arthrex, Inc.*, 594 U. S. 1, 23–26 (2021) (plurality opinion). But, if Congress never vested the appointment of an officer in a department head in the first place, this option is off the table. Justice Gorsuch and I have criticized the Court's severability doctrine as inconsistent with traditional remedial principles. See *id.*, at 32–33 (Gorsuch, J., concurring in part and dissenting in part); *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 251–253 (2020) (Thomas, J., concurring in part and dissenting in part). But, so long as this Court adheres to the doctrine, the question of a department head's statutory authority is very likely to emerge at the remedial stage. This reality counsels further in favor of resolving statutory challenges to appointment authority before constitutional challenges.

[5] Although prudence counsels in favor of deciding the statutory question first, the Fifth Circuit's decision to skip over it was understandable. The District Court passed on only the constitutional question because the Government at that time did not claim that it was the Secretary's responsibility to appoint the Task Force's members. Like us, the Fifth Circuit is not supposed to be a court of first view, so it decided only the question on which it had a lower court decision from which to work. The fault for the unusual posture of this case lies principally with the Government for adopting an entirely new theory on appeal.

### III

If forced to decide, I would affirm on the ground that Congress has not given the Secretary of HHS the power to appoint Task Force members. The members must therefore be appointed by the President with Senate confirmation.

### A

A department head may appoint an inferior officer only if Congress has "by Law vest[ed] the Appointment of such" officer in him. Art. II, §2, cl. 2. At the time of the framing, "'by Law'" of course meant "by statute." *Lucia*, 585 U. S., at 254 (Thomas, J., concurring); see *United States* v. *Maurice*, 26 F. Cas. 1211, 1213 (No. 15,747) (CC Va. 1823) (Marshall, C. J.). "[T]he verb 'appoint' meant '[t]o establish any thing by decree' or '[t]o allot, assign, or designate.'" *NLRB* v. *SW General, Inc.*, 580 U. S. 288, 312–313 (2017) (Thomas, J., concurring) (quoting 1 S. Johnson, A Dictionary of the English Language (def. 3) (6th ed. 1785); 1 N. Webster, An American Dictionary of the English Language (def. 3) (1828); citations omitted). Thus, to vest appointment power for an office in a department head, Congress must pass a statute giving him the authority to assign a person to that office.

The vesting of appointment authority must be explicit. When reading two legal texts together, the "specific controls" over the "general." *National Cable & Telecommunications Assn., Inc.* v. *Gulf Power Co.*, 534 U. S. 327, 335–336 (2002). The Appointments Clause's default rule of appointment by the President with Senate confirmation specifically addresses how an inferior officer is to be appointed. Appointment authority therefore cannot be deemed implicit in a more general grant of authority to a department head; only a provision that specifically addresses appointment can displace the default. And, because the Appointments Clause's default rule, as a *constitutional* provision, is of greater "dignity" than a *statute*, we should not presume that Congress meant to set it aside if the question is doubtful. See A.

Scalia & B. Garner, Reading Law 187 (2012) (Scalia & Garner). In particular, we cannot infer appointment authority from a principal officer's authority to supervise an inferior officer. By its default rule, the Appointments Clause *presumes* that an inferior officer will act at the direction of a principal officer and yet be appointed by the President with Senate confirmation.

Further, the statute must vest the power in the department head himself, not one of his subordinates. By limiting the executive officials who can appoint inferior officers to "the President" and "the Heads of Departments," Art. II., § 2, cl. 2, the Appointments Clause prohibits the exercise of appointment authority by inferior officers, even though in other contexts a department head can validly act through such subordinate officers. See Scalia & Garner 107 ("The expression of one thing implies the exclusion of others" (boldface deleted)). Thus, a law purporting to vest the appointment power in an officer below a department head is not a backdoor way of vesting power in the head; it is a "clearly unconstitutional" enactment. *Edmond*, 520 U. S., at 658; accord, 11 Op. Atty. Gen. 209, 213 (1865).

Our precedents illustrate these principles. In 1866, Congress "authorized" an "assistant treasurer . . . to appoint, *with the approbation of the Secretary of the Treasury*," certain "clerk[s]." 14 Stat. 202 (emphasis added). Because the statute required the Secretary's personal approval, this Court held that such clerks were "appointed by the head of a department within the meaning of the" Appointments Clause. *United States* v. *Hartwell*, 6 Wall. 385, 393–394 (1868). In contrast, the Court held that a statute authorizing the "collector" of customs to employ "clerks," Rev. Stat. § 2634 (repealed), did not vest the appointment power in the Secretary of the Treasury, even though the collector was subordinate to that Secretary. *United States* v. *Smith*, 124 U. S. 525, 532–533 (1888). Unlike in *Hartwell*, no "act of Congress" established that the clerks' appointment "could

only be made with the approbation of the Secretary." 124 U. S., at 532; see also *United States* v. *Germaine*, 99 U. S. 508, 511 (1879) (holding that Congress cannot vest the appointment power by conferring it on officials who are "the mere aids and subordinates of the heads of the departments").

The Executive Branch—despite having every institutional incentive to avoid the hurdle of Senate confirmation—has also long recognized that only an explicit statute can vest the appointment power. For over 170 years, the Attorney General has held that "without there be[ing an] *express* enactment to the contrary, . . . the appointment of any officer of the United States belongs to the President, by and with the advice and consent of the Senate." 6 Op. Atty. Gen. 1 (1853) (emphasis added); accord, 15 Op. Atty. Gen. 449, 450 (1878); 17 Op. Atty. Gen. 532, 533 (1883); 26 Op. Atty. Gen. 627, 629 (1908); 29 Op. Atty. Gen. 116, 117 (1911); 38 Op. Atty. Gen. 566, 574 (1937); 20 Op. OLC 124, 139, n. 46 (1996). In 1908, for instance, Congress created the office of Second Deputy Comptroller of the Currency, to assist the Comptroller and the First Deputy with their duties. 35 Stat. 203. Although Congress had vested the authority to appoint the Comptroller and First Deputy in the Secretary of the Treasury, it enacted no language to that effect for the Second Deputy. See 26 Op. Atty. Gen., at 629. Despite finding the result "anomalous," the Attorney General concluded that the Secretary did "not possess the power to appoint this Second Deputy." *Ibid.*

Finally, because of the need for vesting to be explicit, Congress's choice of words matters. When the First Congress sought to vest the appointment of an inferior officer in a department head, it usually, if not always, enacted a provision stating that the head shall "appoint" the officer. See, *e. g.*, 1 Stat. 29, 50, 65, 68. Although "appoint" is not the only verb that Congress can use, see *SW General*, 580 U. S., at 313 (THOMAS, J., concurring), this Court has been reluctant to find a vesting where the statute in question uses a verb

that Congress does not typically employ to confer appointment authority.   See *Edmond*, 520 U. S., at 657 (holding that the power to "assign" military judges is not the power to "appoint" them, because "Congress has consistently used the word 'appoint'" to vest appointment power for "military positions"); *Weiss* v. *United States*, 510 U. S. 163, 171–173 (1994) (similar); *Auffmordt* v. *Hedden*, 137 U. S. 310, 326–327 (1890) (finding no vesting of appointment authority in part because "[t]he statute does not use the word 'appoint,' but uses the word 'select'").

The Appointments Clause's default of appointment by the President with Senate confirmation can lead to inefficient and sometimes "anomalous" results.   See 26 Op. Atty. Gen., at 629.   But, it is our job to enforce it.   "We cannot cast aside the separation of powers and the Appointments Clause's important check on executive power for the sake of administrative convenience or efficiency."   *SW General, Inc.*, 580 U. S., at 317 (THOMAS, J., concurring).

### B

The Government's theory is that Congress vested the appointment of the Task Force in the Secretary through a *combination* of two statutes.   *First*, it reads the AHRQ Director's power to "convene" the Task Force under 42 U. S. C. §299b–4(a)(1) to include the power to appoint its members. *Second*, it asserts that the Reorganization Plan transfers the "functions" of the Director, including the power to appoint, to the Secretary of HHS.   §1(a), 80 Stat. 1610.   Neither premise is correct.

### 1

The Director's power to "convene" the Task Force does not include the power to appoint its members.   This premise conflicts with both ordinary meaning and the canon of constitutional avoidance.

To "convene" a group means "to cause" it "to assemble." Merriam-Webster's Collegiate Dictionary 272 (11th ed. 2005); accord, American Heritage Dictionary 400 (4th ed. 2000)

("[t]o cause to come together formally"); Black's Law Dictionary 380 (9th ed. 2009) ("[t]o call together; to cause to assemble"); New Oxford American Dictionary 379 (3d ed. 2010) ("bring together for a meeting or activity; assemble"). That task is different from selecting the membership of the group. The President "may, on extraordinary Occasions, convene both Houses" of Congress. U. S. Const., Art. II, §3. That provision means that he can make Congress meet, not that he can appoint Senators and Representatives. Likewise, if someone says that the President "convened" his Cabinet last Thursday, that statement means that the President held a meeting with the Cabinet members on that day, not that he appointed the Cabinet members. The Director's power to convene the Task Force thus cannot be the explicit grant of appointment power needed to displace the default established by the Appointments Clause.

Context supports giving "convene" its ordinary meaning. Task Force members are unpaid, part-time volunteers, who ordinarily meet three times a year. 89 Fed. Reg. 101606 (2024). To facilitate these volunteer meetings, Congress directed that AHRQ "shall provide ongoing administrative, research, and technical support for the operations of the Task Force." 42 U. S. C. §299b–4(a)(3). Part of that support naturally includes determining when, where, and how the Task Force will meet—*i. e.*, convening it. Using the ordinary definition of "convene" therefore makes sense in the context of §299b–4(a)(1); there is no need to stretch the term to mean "appoint."

The remainder of the Public Health Service Act, in which AHRQ's governing statutes are housed, reinforces that the power to "convene" is not the power to appoint. The Act repeatedly provides for the appointment of inferior officers simply by stating that the Secretary shall "appoint" them. See, *e. g.*, §§237(b), 242k(a), 247d–7e(c)(3), 284(a)(1), 286a(a)(1)(A), 299(a), 300cc–40(a), 300hh–15(a), 300u–7(a). In contrast, neither the Government nor the majority can identify

Thomas, J., dissenting

a single other instance where the Act uses "convene" to vest the appointment of an inferior officer. Since Congress generally chose to track the language of the Appointments Clause when vesting appointment power in the Act, we should not expect the term "convene" to do so. See *Edmond*, 520 U. S., at 657; *Auffmordt*, 137 U. S., at 327.

The Government's reading of "convene" is even more implausible in the context of its theory that Congress meant to vest *the Secretary* with the appointment power by giving *the Director* the power to convene. We presume that Congress "generally employ[s] the words which most directly and aptly express the ideas [it] intend[s] to convey." *Gibbons* v. *Ogden*, 9 Wheat. 1, 188 (1824). Had Congress meant to confer the appointment power on the Secretary, surely it would have just done so directly—as it did in many other provisions of the Public Health Service Act. *Supra*, at 808 and this page. The implausibility of Congress vesting appointment authority in this oblique way—something it apparently has nowhere else done—makes it all the less likely that Congress meant "appoint" when it said "convene."

Were there any doubt, the canon of constitutional avoidance makes clear that the power to "convene" does not include the power to appoint. A statute vesting the appointment power in the Director, who is not a department head, would be "clearly unconstitutional." *Edmond*, 520 U. S., at 658. We must therefore read §299b–4(a)(1) not to confer appointment authority if it is "fairly possible" to do so. *Jin Fuey Moy*, 241 U. S., at 401. And, of course, it is "fairly possible" to read "convene," whose core meaning is simply to cause to assemble, not to encompass appointment. See *supra*, at 807–808.[6] Because we can avoid reading §299b–

_____

[6] The Government and the majority both agree that "'convene' doesn't necessarily connote appointment." Tr. of Oral. Arg. 6; see *ante*, at 781. The most recent version of the Task Force's Procedure Manual even says that "AHRQ convenes the Task Force," while "the Secretary of HHS selects new members" to serve on it—thereby recognizing the distinction

4(a)(1) to vest appointment power in the AHRQ Director, we must.

2

Even if Congress unconstitutionally vested appointment power in the Director, the Reorganization Plan does not transfer that power to the HHS Secretary. The Plan "transfer[s]" "all functions" of the "officers and employees of the Public Health Service"—including the AHRQ Director— "to the Secretary." §1(a), 80 Stat. 1610. But, for four reasons, the power to appoint the Task Force cannot be a "function" transferred by the Plan.

*First*, the Reorganization Plan does not apply to functions that did not exist when the Plan was issued in 1966. This conclusion follows from the legal backdrop surrounding the Reorganization Plan's issuance. The Plan was originally a Presidential directive, not a statute. The Reorganization Act authorized the President to submit to Congress reorganization plans for executive departments. If neither House of Congress objected within 60 days, a plan acquired the force of law. 5 U. S. C. §906(a) (1964 ed., Supp. II). President Johnson submitted a Reorganization Plan for the Public Health Service under this procedure in 1966. 80 Stat. 1610. Following *INS* v. *Chadha*, 462 U. S. 919 (1983), which held that single-House vetoes of agency action are unconstitutional, Congress in 1984 enacted a statute that "ratifies and affirms as law" all previously implemented reorganization plans. 98 Stat. 2705.

The Reorganization Act prohibited plans from "authorizing an agency"—which includes the Secretary—"to exercise a function which is not expressly authorized by law *at the time the plan is transmitted to Congress*." §905(a)(4) (emphasis added); see §902(1)(B) (defining "agency" to include an "officer . . . in or under an Executive agency").

_____

between convening and appointing. U. S. Preventive Services Task Force, Procedure Manual §§ 1.5.1, 1.9 (Apr. 2023), https://www. uspreventiveservicestaskforce.org/uspstf/about-uspstf/methods-and-processes/procedure-manual/procedure-manual-section-1.

The Reorganization Plan must be read in harmony with this limit. We must assume, given the overlap in terminology, that the "transfe[r]" of "functions" effected by the Plan has the same scope as the "transfer" of "functions" authorized by the Act. Reorganization Plan §1(a); 5 U. S. C. §903(a)(1) (1964 ed., Supp. II); see *George* v. *McDonough*, 596 U. S. 740, 746 (2022) (Where a legal text employs a term "obviously transplanted from another legal source, it brings the old soil with it" (internal quotation marks omitted)). We must likewise presume that President Johnson did not mean to exceed the limits on his authority imposed by the Reorganization Act. See Scalia & Garner 66 ("An interpretation that validates outweighs one that invalidates" (boldface deleted)). Accordingly, the term "functions" in the Plan must have, at most, the same meaning as it does in the Act. See Reorganization Plan §1(a); 5 U. S. C. §903(a)(1) (1964 ed., Supp. II). The Plan thus cannot transfer "functions" that did not exist in 1966, such as the AHRQ Director's duty to convene the Task Force.

*Second*, the Reorganization Act prevents us from reading "functions" to encompass the authority to appoint officers. Separately from its authorization of a "transfer" of "functions," §903(a)(1), the Act states that a plan may "provide for the appointment and pay of the head and one or more officers of an agency . . . if the President finds, and in his message transmitting the plan declares, that by reason of a reorganization made by the plan the provisions are necessary." §904(2). And, "if the appointment is not to a position in the competitive service, it shall be by the President, by and with the advice and consent of the Senate." *Ibid.* The Act thus distinguishes between a transfer of functions and a conferral of appointment authority, with special procedural requirements imposed on the latter.

Here, the Plan provides only for a transfer of functions. See §1(a). It therefore cannot be read to authorize the appointment of officers. Cf., *e. g.*, Reorganization Plan No. 3 of 1949, 63 Stat. 1066 (transferring functions and providing for

the appointment of inferior officers in distinct sections). Further, President Johnson's transmittal message made none of the findings needed to provide for appointment authority. See Public Papers of the Presidents, Lyndon B. Johnson, Vol. 1, Apr. 25, 1966, pp. 453–456 (1967).   Nor, in any event, could the transmittal message have provided for the appointment *of the Task Force*, which did not exist in 1966.   Finally, even if the Reorganization Plan had provided for the appointment of officers, it could not have authorized the Secretary to appoint them, because the Reorganization Act required all non-civil-service officer positions provided for in reorganization plans to be appointed by the President with Senate confirmation.   § 904(2).   Reading the Plan to transfer appointment authority would thus flout the Act.

*Third*, the appointment of the Task Force cannot be a "function" of the AHRQ Director because the Director cannot *validly* appoint its members under the Appointments Clause.   The term "functions" in the Reorganization Act and Plan is ambiguous.   It could refer either to whatever "functions" an officer is nominally authorized to perform by statute, or it could refer solely to those "functions" that he may perform "*when all applicable law*"—including the Constitution—"*is taken into account.*"   *United States* v. *Briggs*, 592 U. S. 69, 71 (2020) (observing that the same ambiguity arises when a statute refers to crimes " 'punishable by death' "). "[C]ontext is determinative" in resolving this ambiguity. *Id.*, at 73.

Here, the purpose of a "reorganization" plan is to "give a definite and orderly structure to" a department's existing functions, not to create new functions that a department cannot otherwise lawfully perform.   Oxford English Dictionary 923–924 (2d ed. 1989) (defining "organize").   A plan may not, "under the guise of consolidating and rearranging, . . . creat[e] authority in the Executive Branch which had not existed before."   Dept. of Justice, Office of Legal Counsel,

Memorandum of William H. Rehnquist, Assistant Atty. Gen. (Sept. 11, 1969), in Reorganization Plan No. 1 of 1969 (ICC): Hearing before the Subcommittee on Executive Reorganization of the Senate Committee on Government Operations, 91st Cong., 1st Sess., 29 (1969) (Rehnquist Memorandum). Yet, that is precisely what the Government's reading accomplishes, since, without the Reorganization Plan, the Executive has no power to appoint the Task Force outside the gauntlet of Senate confirmation.

*Finally*, reading the Plan to transfer appointment authority creates constitutional problems. If the Reorganization Act authorized the President to make such a transfer, it would be unconstitutional. Only "Congress" can vest the appointment of inferior officers in a department head, and it must do so "by Law." Art. II, § 2, cl. 2. But, the President is not Congress, and an executive edict is not a "Law." See *Lucia*, 585 U. S., at 254 (THOMAS, J., concurring); *Maurice*, 26 F. Cas., at 1213. Additionally, § 2 of the Plan permits the Secretary to "authoriz[e] the performance of any of the functions transferred to him by the provisions of this reorganization plan by any officer" of the Public Health Service or HHS at large. The Secretary, however, is the sole head of HHS. He therefore cannot constitutionally authorize *any other officer* to perform the function of appointing the Task Force. Constitutional avoidance again requires us to reject the Government's reading.

C

The majority embraces both steps of the Government's argument, but its reasoning is unpersuasive.

1

The majority follows the Government in reading "convene" to mean "appoint." Ordinary meaning and the constitutional-avoidance canon again foreclose this approach.

a

The majority finds appointment power in the Director's duty to "convene" only by applying the wrong standard. The majority acknowledges that the term "convene" "could mean to merely 'call together' or 'assemble.'" *Ante*, at 781. But, it asserts that, in the absence of a separate, explicit "provision specifying who is to appoint the individuals to be called together or assembled," it is reasonable to infer that "the person with the power to convene is also the person with the power to appoint." *Ibid.* There *is*, however, a separate provision—the Appointments Clause, which specifically addresses how all inferior officers are to be appointed. Its default rule controls absent an "express enactment to the contrary." 6 Op. Atty. Gen., at 1. By definition, an interpretation that relies on an inference from the absence of a separate appointment provision cannot "expressly" overcome the default. Contra, *ante*, at 779, 787, 792.

The same problem plagues the majority's examples of Congress purportedly using "the term 'convene' to authorize an official to both assemble a body and select its members." *Ante*, at 781. To begin, it begs the question to list a handful of statutes that use the term "convene" and then simply declare that they confer appointment authority because the statutes do not elsewhere specifically address appointments. That assumption does not follow. Take the majority's lead example, the convening of military commissions under 10 U. S. C. § 948h. The Secretary of Defense has no need to divine implicit authority to name military commission members from his authority to "conven[e]" them, because, as the majority admits, a neighboring provision states that the Secretary "shall detail" certain "commissioned officer[s] of the armed forces" to serve on military commissions. §§ 948i(a), (b); see *ante*, at 781.

But, even granting the majority's premise that these statutes implicitly confer member-selection authority through the power to "convene," the statutes are inapposite because

none involves the appointment of officers. To return to
§ 948h, "detailing" *already commissioned* military officers to
serve on a military tribunal is not an appointment to office
under the Appointments Clause; it is simply the conferral of
additional related duties on an officer who has already been
appointed pursuant to the Clause. See *Weiss*, 510 U. S., at
172–176. That is why the Secretary can delegate detailing
authority to an inferior "officer or official of the United
States," which he could not do if naming commission mem-
bers constituted an appointment. See §§ 948h, 948i(b). The
majority's other examples similarly involve statutes giving
related duties to already commissioned officers.[7]

The majority's examples therefore tell us nothing about
whether the term "convene" confers appointment authority
explicitly enough to overcome the constitutional default. Of
course, *outside the appointments context*, authority to "con-
vene" a group can imply authority to select its members. If
a group does not already exist, and no other provision ad-
dresses how the group's members are named because the
Appointments Clause does not apply, an officer may be able
to "convene" the group only if he first names its members.
In that case, the predicate-act canon would justify inferring
naming authority. See Scalia & Garner 192 ("Authorization
of an act also authorizes a necessary predicate act" (boldface
deleted)). But, that canon cannot apply when the Appoint-
ments Clause provides the default rule for naming a group's
members: "'[W]here the means for the exercise of a granted
power are given, no other or different means can be im-
plied.'" *Id.*, at 193. Hence, the majority can produce no
examples where Congress has used "convene" to confer ap-
pointment authority.

---

[7] See §§ 14903(a), 14906 (providing that a "board of inquiry" be made up
of "officers" holding "a grade above major or lieutenant commander"); 14
U. S. C. § 3703(a) (providing for a "Coast Guard Reserve Policy Board"
made up of active-duty and reserve officers of the Coast Guard); 33 U. S. C.
§ 3022(a) (providing for a "personnel board" comprising "officers . . . in . . .
or above" a certain "grade").

For the same reason, the majority errs in emphasizing AHRQ's power to convene Task Force members when Congress first codified its relationship to the Task Force in 1999. At that point, the Task Force was a purely advisory, nonofficer body that disbanded upon issuing its recommendations. See App. 37–38 (noting that the Task Force became a permanent body with staggered appointments in 2001). It may have been fair then to infer a power to appoint Task Force members from the power to "convene" them. But, when a statutory term draws a particular meaning from its context, that meaning "may change in light of a subsequent enactment" that alters the context. Scalia & Garner 254–255. So it goes for the Task Force after the ACA: With that 2010 legislation, Congress converted the Task Force into an "independent" standing body of officers with a detailed list of duties and the authority to issue recommendations with the force of law. See 42 U. S. C. §299b–4(a).[8] That change brought the Appointments Clause into the picture, and its default mode of appointment displaced any appointment authority that might otherwise have been *implicit* in the Director's power to "convene."[9]

-----

[8] For this reason, the majority is wrong to assert that "the relevant statutory text *did not* change in 2010." *Ante*, at 788. As the majority recognizes, the meaning of "convene" in §299b–4(a)(1) depends on its "context," *ante*, at 781, and that context changed dramatically with the enactment of the ACA.

[9] The intervening passage of the ACA also makes the majority's appeals to "consistent Executive Branch practice" fall flat. *Ante*, at 783 (citing *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 394 (2024)). The Government concedes that its practice from 2010 until its appeal in this suit was for the AHRQ Director to appoint Task Force members *invalidly*, based on the *mistaken* view that the members were not officers. See Brief for Federal Defendants in *Braidwood Mgmt., Inc.*, No. 23–10326 (CA5), ECF Doc. 159, pp. 31, n. 2, 41. The practice thus sheds no light on whether the Director's convening power constitutes an express vesting of appointment authority that overcomes the constitutional default. And, surely this Court did not overrule *Chevron U. S. A. Inc.* v. *Natural Re-*

Thomas, J., dissenting

The majority likewise cannot explain why Congress would vest appointment authority using the term "convene" when it consistently uses "appoint" in other provisions of the Public Health Service Act. *Supra*, at 808–809. True, the Appointments Clause does not impose a "magic words" requirement to vest appointment authority, *ante*, at 780, but it is uncontroversial that "different terms" in a statutory scheme "usually have different meanings," *Pulsifer* v. *United States*, 601 U. S. 124, 149 (2024) (citing Scalia & Garner 170–171). As our precedents have repeatedly recognized, if Congress generally uses the term "appoint" to vest appointment authority within a particular statutory scheme, we should be more reluctant to find an express vesting of appointment authority in a provision that uses a different term. See *Edmond*, 520 U. S., at 657; *Weiss*, 510 U. S., at 171–172; *Auffmordt*, 137 U. S., at 326–327.[10]

Nor can the majority make sense of why Congress would choose to vest appointment power in the Director, only so that it could be transferred to the Secretary. The best explanation the majority can give is that "it is no surprise that the 1999 statute did not expressly name the Secretary" as

---

*sources Defense Council, Inc.*, 467 U. S. 837 (1984), only to defer to concededly unlawful executive action.

[10] As the majority notes, *ante*, at 781, I have previously found that the President's power to "direct" an official to "perform the functions and duties of" an "office temporarily" under the Federal Vacancies Reform Act of 1998 (FVRA) is a vesting of appointment authority. 5 U. S. C. §§ 3345(a)(2), (3); see *NLRB* v. *SW General, Inc.*, 580 U. S. 288, 312–313 (2017) (concurring opinion). But, there, context made unmistakably clear that the President's power to "direct" was a power to appoint. Section 3345(a) obviously concerns appointment because the sole subject matter of the FVRA is the filling of vacant offices. Congress enacted the provision in a section titled "Federal Vacancies and Appointments." § 151, 112 Stat. 2681–611. And, the provision would be meaningless if it did not authorize the President to fill an office. In contrast, § 299b–4(a)(1) has a perfectly sensible meaning if the Director's power to convene does not include the power to appoint. *Supra*, at 808.

the Task Force's appointing officer, because "the Appointments Clause question arose only in 2010." *Ante*, at 785. But, it *is* a surprise on the majority's view that Congress did not name the Secretary *in 2010*—when Congress "str[uck]" out the 1999 version of § 299b–4(a) and replaced it with a new and much altered version. 124 Stat. 541–542. Congress even made significant changes to the very clause granting the Director convening authority. Compare 113 Stat. 1659 ("'The Director may periodically convene a Preventive Services Task Force . . .'") with 124 Stat. 541 ("'The Director shall convene an independent Preventive Services Task Force . . .'"). Congress thus made a conscious choice to keep convening authority with *the Director*.

Tellingly, the majority struggles to find any precedent for the oblique, two-step theory of vesting that it endorses. The best analogy it can muster is *Hartwell*. There, this Court concluded that Congress had validly vested appointment authority in a department head where the statute allowed an assistant treasurer to name clerks with the "approbation" of the Secretary of the Treasury. 6 Wall., at 393; see *ante*, at 786. But, the statute at issue envisioned the two officers working together in a coherent way. For convenience's sake, the more junior officer identified the clerks to be hired. Then, to satisfy the Appointments Clause, the Secretary gave his personal approval before the appointment took effect. Here, on the Government's account, the Director has no formal role in the appointment process: The *entirety* of the Director's power to convene is transferred to the Secretary, and the Secretary is free to exercise it without any input from the Director. See *ante*, at 784. In other words, according to the Government, when Congress in 2010 provided that "[t]he Director shall convene [the] Task Force," the statute would have had the same legal effect if it had said, "the Secretary (and *not* the Director) shall convene the Task Force." See § 299b–4(a)(1). A far simpler

explanation is that Congress did not mean to vest appointment authority when it granted authority to "convene." [11]

b

Even if the majority had the *better* reading of "convene," it would still be *fairly possible* to read the term to mean only "to assemble." The canon of constitutional avoidance therefore forecloses the majority's interpretation.

The majority does not suggest that its reading would prevail if the constitutional-avoidance canon applies. It instead concludes that there is no constitutional problem to avoid, because the Reorganization Plan "transfers all authority of the AHRQ Director to the Secretary." *Ante*, at 783.

According to the majority, the Reorganization Plan is a mechanism that siphons away any authority granted to the AHRQ Director and automatically redirects it upward to the Secretary. The AHRQ Director may then exercise only those powers that the Secretary "delegate[s]" to him, *ante*, at 785, n. 6—even if a later statute vests those powers with the AHRQ Director directly. This reallocation of the Director's powers guarantees that, no matter how clearly Congress vests the Director with authority, the Director nevertheless remains an empty husk with no powers other than what the Secretary returns to him. Thus, according to the majority, when Congress provided that "[t]he Director shall convene" the Task Force, what it *really* meant was, again,

_____

[11] The majority also seeks support from *Edmond* v. *United States*, 520 U. S. 651 (1997), another case in which the Department's Secretary "had not historically appointed" the officers at issue. *Ante*, at 793. But, the statute that the Secretary invoked provided that "[t]he Secretary of Transportation may appoint . . . officers . . . of the Department of Transportation," including the Coast Guard judges involved in the case. 49 U. S. C. § 323(a); see 520 U. S., at 656. The vesting of appointment authority could not have been more explicit. There was no need to string together two ambiguous statutes enacted decades apart to find that Congress had departed from the constitutional default.

that "the Secretary (and *not* the Director) shall convene" the Task Force. This reading of the Reorganization Plan is incorrect. But, even if it were right, it would still leave a constitutional problem.

The simplest response to the majority is that the Reorganization Plan does not in fact transfer any appointment power that the AHRQ Director may have, for the reasons I have explained. See *supra*, at 810–813. But, even if the Reorganization Plan vested the Director's convening authority in the Secretary, it would not follow that the Director automatically loses that authority. It is the norm in the Executive Branch for subordinates and superiors to possess, in a sense, the same power. By virtue of the Vesting Clause of Article II, all executive power ultimately belongs to the President; to the extent other Executive Branch officials possess authority, it is only to exercise it "on his behalf." *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 203–204 (2020) (plurality opinion). Congress frequently recreates this structure in miniature within departments. Several departments, for example, have vesting clauses conferring all the department's authority on its secretary, while at the same time other provisions confer specific powers and duties on inferior officers within the department.[12] Thus, even if the Reorganization Plan prospectively transfers all authority conferred by later enacted statutes on officers in the Public Health Service, there is no reason to think that the Plan meant to depart from the norm of shared executive power.

The majority's empty-husk theory is also hard to square with Congress's legislation regarding AHRQ. "'Congress presumably does not enact useless laws.'" *Garland* v. *Cargill*, 602 U. S. 406, 427 (2024). And, Congress has painstakingly defined the powers and responsibilities of the Agency,

---

[12] See, *e. g.*, 6 U. S. C. § 112(a)(3) (Department of Homeland Security); 22 U. S. C. § 2651a(a)(3)(A) (Department of State); 28 U. S. C. § 509 (Department of Justice).

and its relationship to other entities in HHS, across no fewer than 33 U. S. Code provisions. See §§ 299 to 299c–7. Congress established AHRQ and provided for all its powers after the Reorganization Plan. Yet, if the majority is right, there was no need to structure AHRQ in any detail, because all the powers conferred on the Agency in fact belong to the Secretary alone.

Not even the majority is willing to follow its interpretation of the Reorganization Plan to its logical conclusion. According to the majority, the Task Force is a Public Health Service agency subject to the Reorganization Plan. See *ante*, at 766, n. 3. Yet, the majority describes the Task Force as having certain duties conferred by statute, see *ante*, at 755–757, and then, in its constitutional analysis, discusses at length how a "collection of statutes" allows the Secretary to exercise adequate supervision over the performance of those duties, see *ante*, at 766–770, 772–779. But, this analysis is all superfluous under the majority's interpretation of the Reorganization Plan, wherein all the Task Force's nominal powers really belong to the Secretary, who can exercise them directly or delegate them to *any* agency within HHS. On this view, the Task Force can exercise authority only at the sufferance of the HHS Secretary.

Even accepting the majority's empty-husk theory, however, we would still need to apply constitutional avoidance. If Congress is not utterly irrational, its detailed allocations of authority to agencies within the Public Health Service in post-Reorganization Plan statutes must at least carry some precatory force. In other words, even on the majority's interpretation of the Reorganization Plan, Congress at least *recommended* that the AHRQ Director exercise the power to convene the Task Force. "Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States." *Rostker* v. *Goldberg*, 453 U. S. 57, 64 (1981). We must therefore presume that, in all of its "judgments," even precatory ones, it

means to adhere to the Constitution. *Ibid.* Thus, even on the empty-husk view of the Reorganization Plan, we would still have a duty to avoid reading the power to "convene" as the power to appoint if fairly possible.

Finally, the majority suggests that, even if Congress has "vested appointment authority in *both* the Secretary and the AHRQ Director," that decision raises no "constitutional concerns so long as the Secretary was the one to actually make the appointments." *Ante*, at 792, n. 7. Not so. When choosing between possible readings of a statute, we must adopt the one that will prevent the statute from being unconstitutional in any respect, even if the statute is constitutional as applied to the case before us. See *Clark* v. *Martinez*, 543 U. S. 371, 380–383 (2005). And, if the power to convene includes the power to appoint, then §299b–4(a)(1) is unconstitutional insofar as it confers authority on the Director. There is no escaping the canon of constitutional avoidance, and applying that canon, "convene" clearly cannot mean "appoint."

2

Even if Congress had vested appointment power in the Director, the majority is still incorrect to hold that the Reorganization Plan transfers that power to the Secretary.

To begin, the power to appoint the Task Force is not a "function" of the Director because the appointment of an officer is not a "function" under the Reorganization Act and because appointment is not a power the Director *validly* enjoys. See *supra*, at 811–813. The majority disregards these defects in its reading.

Nor can the majority explain why the Reorganization Plan extends to later enacted functions. The majority appeals to the Dictionary Act, *ante*, at 789, but that Act recognizes that "the present tense" does not "include the future" where "context indicates otherwise." 1 U. S. C. §1. Here, the Reorganization Act supplies critical contrary context by providing that a reorganization plan cannot "authoriz[e] an agency

to exercise a function which is not expressly authorized by law *at the time the plan is transmitted to Congress*." 5 U. S. C. §905(a)(4) (1964 ed., Supp. II) (emphasis added). The majority objects that this provision bars *the President* from acting, not *Congress*. *Ante*, at 789–790. But, while Congress is welcome to confer new powers on the Secretary whenever it likes, it chose in 42 U. S. C. §299b–4(a)(1) to confer authority on the Director. The Reorganization Plan cannot alter that allocation of authority unless *the President* violated §905(a)(4) by issuing a plan that applies to future enactments.[13]

The majority's concern appears to be that applying §905(a)(4) as written would produce "untenable—bordering on absurd—results" by giving the Secretary no control over post-1966 functions of the Public Health Service. *Ante*, at 790. That concern is misplaced. As Congress has enacted new functions for the Public Health Service, it has conferred new grants of supervisory authority to go with them. When Congress established AHRQ, for instance, it provided that "[t]he Secretary shall carry out this subchapter acting through the Director," thereby giving the Secretary control

———————

[13] The majority seeks support from an Office of Legal Counsel memorandum authored by the future Chief Justice Rehnquist. *Ante*, at 789–790. But, that memorandum merely cautions against an unduly strict reading of the phrase " 'expressly authorized by law.' " Rehnquist Memorandum 29. It says nothing about the temporal limit imposed by 5 U. S. C. §905(a)(4). The majority also cites 1966 congressional testimony by the then Secretary stating that the Reorganization Plan would give him "the 'flexibility' 'to reorganize' the Service" both in 1966 "and 'at any future time.' " *Ante*, at 790–791. This "legislative history is not the law." *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 523 (2018). And, in any event, the Secretary never testified that the Reorganization Plan would override future statutes creating agencies within the Public Health Service or vesting authority in officers of the Public Health Service. Nor would applying §905(a)(4) as written prevent the Secretary from restructuring the powers conferred on him by the Plan at any future time. It would prevent him only from claiming that later conferred powers fall within the scope of the Plan.

over all of AHRQ's functions. 42 U. S. C. § 299(a). Congress has also generally provided that "[t]he Public Health Service . . . shall be administered by the Assistant Secretary for Health under the supervision and direction of the Secretary." § 202. Any new enactment concerning the Public Health Service will therefore fall within the Secretary's purview, without any need to rely on the Reorganization Plan. The real absurdity is to hold, as the majority does, that Congress can establish an entire agency and set out its functions in minute detail only for the Reorganization Plan to automatically deprive the agency of those functions. See *ante*, at 784.

The majority also cannot brush aside the problem that a presidentially issued reorganization plan is not a "law" that can confer appointment power. The majority claims that point is "irrelevant" because Congress made the Plan a law when it ratified the Plan in 1984. *Ante*, at 788. But, the 1984 Act simply "ratifie[d] and affirm[ed]" the Plan as it then existed. 98 Stat. 2705. It did not purport to expand the "functions" transferred by the Plan. And, we must presume that the Plan, when issued, was consistent with both the Reorganization Act and the Constitution. Thus, any reading that, like the majority's, would have unnecessarily placed the Plan in conflict with either of those authorities must be rejected.

Finally, the majority mistakenly contends that constitutional avoidance supports its reading of the Reorganization Plan. *Ante*, at 792–793. An essential premise of the majority's argument is that Congress has unconstitutionally vested appointment power in (or, at a minimum, has encouraged the Secretary to unconstitutionally delegate appointment power to) the AHRQ Director. *Supra*, at 809, 821. Reading the Reorganization Plan to transfer appointment power does not make that defect disappear. It only creates new constitutional problems—namely, by authorizing the Secretary to delegate appointment authority to other officers in HHS and by implying that the Reorganization Act authorized the

President to vest the appointment of officers. *Supra*, at 813. The only approach that genuinely avoids a constitutional problem is the one that the majority refuses to entertain: reading the Director's convening power not to encompass the power to appoint.

## IV

The majority's erroneous statutory holding may save the Secretary's midappeal claim of authority, but it makes hash of Congress's design. Congress established the Task Force to be an independent agency that answers directly to the President. By misinterpreting the statute, the Court reconfigures the Task Force to be subordinate to the Secretary of HHS.

Because the majority concludes that Congress has vested the appointment power for the Task Force in the Secretary, it must also consider whether the Task Force's members are principal or inferior officers under the Appointments Clause. The majority holds that they are inferior because (1) the Secretary can remove Task Force members at will, and (2) the Secretary can directly review and block the Task Force's recommendations. *Ante*, at 762. But, the majority's statutory error infects its reasoning on both points.

As I have noted, the power to remove follows the power to appoint. *Supra*, at 802. The majority's sole basis for finding that the Secretary can remove Task Force members is its erroneous statutory holding. See *ante*, at 763–764.

The majority's threshold error likewise leads it to read in a power of direct supervision that would not otherwise exist. Because, on the majority's view, the Task Force's constitutionality turns on whether it is subordinate to the Secretary, it *must* find that the Secretary has control over the Task Force if it fairly can. See *supra*, at 802. But, viewing the question as one of pure statutory interpretation, it is clear that Congress did not mean for the Secretary to exercise control over the Task Force's recommendations.

The majority relies on 42 U. S. C. § 202 and the Reorganization Plan to find that the Secretary has "general supervisory authority" over the Task Force (although, again, there would be no reason to discuss any other statute if the majority took seriously its own interpretation of the Reorganization Plan). *Ante*, at 766. The former provides that the Public Health Service "shall be administered . . . under the supervision and direction of the Secretary," § 202, and the latter that the Secretary may perform "all functions of the Public Health Service," Reorganization Plan § 1(a). A key premise of the majority's analysis is thus that the Task Force is part of the Public Health Service.

By statute, the Public Health Service "shall consist of" AHRQ and four other agencies not relevant here. 42 U. S. C. § 203. Thus, the only way to conclude that the Task Force is part of the Public Health Service is to find that it is part of AHRQ. See Tr. of Oral Arg. 33–34.

The Task Force is not part of AHRQ. Section 299b–4(a)(1) provides that the AHRQ Director shall convene an "*independent* Preventive Services Task Force." (Emphasis added.) When modifying a federal agency, the term "independent" often means "not part of and . . . therefore independent of any other unit of the Federal Government." *Collins* v. *Yellen*, 594 U. S. 220, 248 (2021); see, *e. g.*, *Harrow* v. *Department of Defense*, 601 U. S. 480, 482 (2024); *Federal Election Comm'n* v. *Beaumont*, 539 U. S. 146, 149 (2003); J. Selin & D. Lewis, Administrative Conference of the United States, Sourcebook of United States Executive Agencies 17–18 (2d ed. 2018). That subsection (a)(1) uses "independent" in this sense is clear from its contrast with subsection (b)(1), which "establishe[s] *within the Agency* [*i. e.*, AHRQ] a Center for Primary Care Research." (Emphasis added.) Further, subsection (a)(3), entitled "Role of Agency," provides that "[t]he Agency shall provide ongoing administrative, research, and technical support for the operations of the Task

Force."  If the Task Force were part of AHRQ, presumably all of subsection (a), and not simply subsection (a)(3), would describe the Agency's role.  And, it is awkward to refer to an agency as "provid[ing] support for" a part of itself.  Finally, subsection (a)(6) provides that the members of the Task Force and their recommendations "shall be independent and, to the extent practicable, not subject to political pressure."  This language implies that the Task Force is not subject to supervision beyond the supervisory authority that the President holds over all executive officers under Article II.

It is not difficult to see why Congress might have wanted to make the Task Force independent of the HHS Secretary. Congress presumably thought that the "individuals with appropriate expertise" who serve on the Task Force would be better positioned than the Secretary to determine "the effectiveness, appropriateness, and cost-effectiveness of clinical preventive services" by the standards of "scientific evidence." §299b–4(a)(1).  Congress's choice to make the Task Force answer directly to the President thus likely reflects an important policy judgment.

Before adopting its new theory on appeal, the Government had consistently understood the Task Force to be independent of AHRQ and HHS.  Task Force recommendations, which are published by AHRQ, contain the disclaimer that the Task Force's views are not "an official position of AHRQ or the U. S. Department of Health and Human Services." U. S. Preventive Services Task Force, The Guide to Clinical Preventive Services (2014).  AHRQ's website explains that, "[w]hile AHRQ staff supports the Task Force, . . . the Task Force is an independent body, and its work does not require AHRQ or HHS approval." [14]  And, in this very suit, the Government initially asserted that the Task Force "is not part of" AHRQ, and characterized the Task Force as "an

_____

[14] U. S. Preventive Services Task Force (Sept. 2024), https://www.ahrq.gov/cpi/about/otherwebsites/uspstf/index.html.

independent body of medical experts" acting "independently
for [its] own purposes."   ECF Doc. 64, at 51–52, and n. 27.

The majority maintains that the Task Force is part of the
Public Health Service because it is " 'convened' " and " 'sup-
ported by the Public Health Service.' "   *Ante*, at 768, n. 5.
Congress has told us, however, that the Task Force is part
of the Public Health Service only if it is part of AHRQ.   See
42 U. S. C. §203.   That " 'explicit definition' " must " 'con-
trol' " our analysis.   *Burgess* v. *United States*, 553 U. S. 124,
129–130 (2008).   Neither consideration that the majority
raises speaks to the dispositive issue whether the Task Force
is part of AHRQ.[15]   Perhaps the analysis would be different
if the only alternative were to deem the Task Force unconsti-
tutionally structured.   But, looking simply to the best mean-
ing of the language Congress enacted, it is clear that the
Task Force is not part of AHRQ or the Public Health Service

---

[15] The majority also claims that the Task Force is part of the Public
Health Service because the Public Health Service " 'select[s]' " and " 'su-
pervise[s]' " it.   *Ante*, at 768, n. 5.   Both assertions are false.   *First*, as I
have explained, no statute vests the appointment of the Task Force's mem-
bers in the Secretary or any other officer of the Public Health Service.
The majority's reliance on this supposed fact further underscores that its
threshold statutory error infects its supervision analysis.   *Second*, it begs
the question to argue that the Task Force is part of the Public Health
Service because the Public Health Service supervises it.   We cannot know
whether the Public Health Service has legal authority to supervise the
Task Force unless we *first* determine that the Task Force is part of the
Public Health Service.   See 42 U. S. C. §202; Reorganization Plan §1(a).
And, as a matter of historical fact, from 2010 until the start of this suit,
the Public Health Service has *not* purported to supervise the Task Force.
See *supra*, at 827 and this page.

The majority further errs in claiming that the challengers concede that
the Task Force is part of the Public Health Service.   *Ante*, at 768, n. 5.
The challengers concede only that the Task Force was "an advisory com-
mittee within the Public Health Service" when it "was first created in
1984."   Supp. Brief for Respondents 1.   They maintain that the ACA ele-
vated the Task Force to the status of "an independent agency."   Brief for
Respondents 53.

more broadly, and thus that it is not subject to meaningful supervision by the Secretary.[16]

The majority protests that we should not lightly conclude that Congress created a "powerful independent agency" with "unchecked power in making preventive-services recommendations of great consequence" for the public. *Ante*, at 778. This rhetoric is entirely out of place. Even if the Task Force is independent of *the Secretary*, it is still subordinate to *the President*, which is all that matters from a constitutional standpoint. The President can remove Task Force members at will. *Myers* v. *United States*, 272 U. S. 52, 163–164 (1926). And, the Vesting Clause may also empower the President to "issue binding orders" to the Task Force and "nullify" its decisions. S. Calabresi & S. Prakash, The President's Power To Execute the Laws, 104 Yale L. J. 541, 584, 596 (1994). Nor need an agency be especially "powerful," *ante*, at 778, to be independent. The Railroad Retirement Board, Peace Corps, and Chemical Safety and Hazard Investigation Board, for example, are all independent agencies despite having relatively narrow authority. See 22 U. S. C. § 2503; 42 U. S. C. § 7412(r)(6); 45 U. S. C. § 231f.

Even more curiously, the majority professes reluctance to find that an agency is independent absent language "explic-

---

[16] The majority also invokes 42 U. S. C. §§ 300gg–13 and 300gg–92. The former provision requires the Secretary to impose a minimum interval of at least one year before the Task Force's recommendations become legally binding. § 300gg–13(b). The latter provision gives the Secretary authority to issue regulations "to carry out the provisions of th[e] subchapter" containing § 300gg–13. The majority concludes that these provisions— *when combined with* the Secretary's purported power to remove the Task Force's members and to supervise them under § 202 and the Reorganization Plan—empower him to control the content of the Task Force's recommendations. *Ante*, at 764–765, 767. Without those additional sources of supervisory power, §§ 300gg–13 and 300gg–92 are best read to give the Secretary power to determine only when insurers can be expected to come into compliance with the Task Force's recommendations, not to control the substance of those recommendations.

itly conferring for-cause removal protection on the agency's leadership" and "an express statement that those agency heads shall be nominated by the President and confirmed by the Senate." *Ante*, at 778. It is unconstitutional for any agency head wielding "significant executive power" to be removable only for cause. *Seila Law*, 591 U. S., at 220; accord, *Trump* v. *Wilcox*, 605 U. S. —— (2025). But, Congress is free to create independent agencies subject to Presidential control if it wishes. We therefore have no business saying that we will not recognize an agency as independent unless Congress also tacks on removal restrictions. In fact, "Congress has described many agencies as 'independent' without imposing any restriction on the President's power to remove the agency's leadership." *Collins*, 494 U. S., at 249 (collecting examples). Likewise, to presume appointment by a department head absent explicit statutory language to the contrary inverts the default mode of appointment established by the Appointments Clause.

In sum, Congress enacted a constitutional, independent Task Force subject to the President's control but not to the control of the Secretary of HHS. To save the Task Force from its threshold error, the majority alters Congress's legitimate design.

\*    \*    \*

Under our Constitution, appointment by the President with Senate confirmation is the rule. Appointment by a department head is an exception that Congress must consciously choose to adopt. The Framers established this rule to ensure that the President is accountable for the selection of officers in the Executive Branch. And, it is the law, whether we agree with it or not. Had the Court taken seriously this rule, it would not have rushed to rule on the Government's new theory, much less adopted it. I respectfully dissent.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None